Henry HONEYWOOD, Fredonia Honeywood, John E. Perry and Helen Perry, individually, jointly, in behalf of themselves and others similarly situated, Plaintiffs,

v.

Nelson A. ROCKEFELLER, Governor of the State of New York, Caroline K. Simon, Secretary of State for the State of New York, Louis J. Lefkowitz, Attorney General of the State of New York, Denis J. Mahon, James M. Power, John R. Crews and Thomas Mallee, Commissioners of the Board of Elections of the City of New York, and Seymour Halpern, Member of Congress, Representing the Fourth Congressional District of New York, Defendants.

No. 62–C–423.

United States District Court
E. D. New York.
Jan. 18, 1963.

Moses M. Falk, New York City, for plaintiffs; Sheldon Fried, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, New York City, pro se and for defendants Governor Rockefeller and Secretary of State; Irving Galt, Asst. Sol. Gen., Sheldon Raab, Deputy Asst. Atty. Gen., of counsel.

Leo A. Larkin, Corp. Counsel for the City of New York, for defendants Commissioners of Board of Elections of the City of New York, by Benjamin Offner, Asst. Corp. Counsel, New York City.

Irving D. Goodstein, New York City, for Seymour Halpern, Member of Congress, representing the Fourth Congressional District of New York.

Before MOORE, Circuit Judge, and BRUCHHAUSEN and ABRUZZO, District Judges.

MOORE, Circuit Judge.

This is another of the numerous cases involving legislative apportionment that have been brought in the courts following the Supreme Court's opinion in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663 (1962). Plaintiffs' claims arise out of the enactment of Chapter 980 of the 1961 Laws of New York, State Law, McKinney's Consol.Laws, c. 57, § 110 et seq. which established new Congressional Districts in New York State necessitated by the reduced allotment of Congressional seats for New York from 43 to 41 following the 1960 decennial census.

For their first cause of action, plaintiffs allege that in changing the old Fourth Congressional District into the new Sixth Congressional District in Queens, the Legislature consciously and purposefully excluded approximately 75–80% of the Negro population residing in the old Fourth; that the Legislature erected a color line running for about 5 miles along the southern perimeter of the district; and that a straight boundary line running along Union Turnpike was

converted into an irregular "W" shaped area with the intention of excluding Negroes residing in the southern portion of the "W" from the new Sixth. Upon the basis of these assertions, they claim that such a redrawing of District lines constitutes a violation of the Fourteenth and Fifteenth Amendments and the so-called Civil Rights Acts (42 U.S.C.A. §§ 1981, 1983).

For their second cause of action, plaintiffs allege that Chapter 980 was designed (1) on a state-wide basis to discriminate against certain citizens who are members of a particular political party to the advantage of another group of citizens who are members of the majority party in the State Legislature at the time Chapter 980 was enacted, and (2) in the Sixth Congressional District for the benefit of the present Congressional representative, Seymour Halpern. They claim that redistricting having the primary effect of advantaging a particular party is a violation of the Fourteenth and Fifteenth Amendments of the Constitution.

Plaintiffs further allege that they are Negro citizens residing in the old Fourth Congressional District entitled to vote therein and that they are bringing this action as a "class suit" on their own behalf and on behalf of all others similarly situated who will be excluded from the new Sixth Congressional District.

The relief requested is that a three-judge constitutional court be convened to hear and decide the case; that the Court adjudge Chapter 980 to be unconstitutional as applied to plaintiffs and the class they represent; that the Court enter preliminary and permanent injunctions against the enforcement of the Act until such time as the New York State Legislature constitutionally redistricts;

that Governor Nelson Rockefeller be enjoined from signing any bill segregating Negroes from whites or designed to advantage one political party; that Seymour Halpern and all other Congressional candidates be enjoined from running for Congressional office in the new Sixth Congressional District unless these plaintiffs and their class are permitted to vote in that election; that the Court retain jurisdiction until proper relief is granted; and that the Court grant any other or further relief as to the Court may seem just and proper.[1]

Plaintiffs, offering no direct proof that the Legislature was motivated by racial considerations in the redistricting of the old Fourth, would have us infer this from the changes that took place. They argue that an L-shaped area in the southeastern portion of the old district, designated as "Area A" on plaintiff's Exhibit 3 attached to their complaint, was removed in forming the new Sixth because 15,000 out of the 17,500 residents in that area were Negroes. They claim that this change resulted in the erection of a 5-mile color line running in part along the northern portion of Area A. The inclusion in the new Sixth of a rectangular area along the southwestern boundary of the old Fourth, designated as "Area B", which is bounded on the south by the Long Island Railroad tracks, is offered as further proof of the racial bias of the Legislature. Area B is almost exclusively white, with a heavy Negro population living south of the boundary line, at least on the eastern side of the Van Wyck Expressway. Plaintiffs also point to a W-shaped deviation from a formerly straight boundary running along Union Turnpike, designated as "Area C". Here 384 Negroes live along

1. The complaint in this action was filed on April 24, 1962. A motion for a preliminary injunction was made the following day and, after a hearing on May 10, 1962, it was denied on May 17, 1962. Instead of proceeding immediately to trial, as suggested by the court, plaintiffs petitioned for a writ of certiorari. This judgment was affirmed *per curiam* by the Supreme Court, 371 U.S. 1, 83 S.Ct. 30, 9 L.Ed.2d 49 (1962). Trial was set for August 27, 1962, and was adjourned at plaintiff's request to September 10, 1962. The trial was held on September 10 and 11, 1962.

the boundary of the excised portion of the old Fourth.

Certain census population figures were offered to demonstrate the overall chang- es in the old Fourth and the surrounding districts. The following is a tabulation of those figures.[2]

| District | Total Population | White | | Negro and other non-white | |
|---|---|---|---|---|---|
| | | Population | % of District | Population | % of District |
| Old Fourth | 467,384 | 444,969 | 95.2% | 22,415 | 4.8% |
| Old Fifth | 391,403 | 309,046 | 79.0% | 82,357 | 21.0% |
| Old Sixth | 507,685 | 478,051 | 94.2% | 29,634 | 5.8% |
| New Sixth [3] | 417,367 | 410,687 | 98.4% | 6,680 | 1.6% |
| New Seventh | 459,844 | 362,662 | 78.9% | 97,182 | 21.1% |
| New Eighth | 432,776 | 403,407 | 93.2% | 29,369 | 6.8% |

———◆———

Another court has recently had occasion to review the legislative history surrounding the enactment of Chapter 980. Wright v. Rockefeller, U.S.D.C.S.D.N.Y., 211 F.Supp. 460. The legislative reports there cited make it clear that the Legislature made an effort to ensure comparative equality of representation throughout the state by using a statewide average of about 409,000 persons per district and keeping a maximum of a 15% variation from that average. Substantial changes in these Queens districts were necessary to bring the old Sixth (now Eighth) with a population of 507,685 into line with the state average.

■■ In our opinion, plaintiffs have not sustained their burden of proving that Chapter 980 is unconstitutional. It is impossible for us to speculate, and indeed it is not our function to do so, on why a district line turns to the right at one street and left at another. There are a myriad of possible variations in the drawing of such lines. The proof adduced at trial on the first cause of action does not support the claim of racial discrimination. Certain areas of the old Fourth other than those already mentioned, designated at trial as "Areas D, G and H", were also removed from that district, and all of these were predominantly white. The mere fact that a substantial number of Negroes living in Area A on one of the boundaries were moved from one district into another is not suf-

2. The figures for the old Congressional districts were obtained through the official count of the returns of the Eighteenth Census of the United States on file in the Bureau of the Census. Those for the new districts are based on a preliminary tabulation made ·by the Bureau of the Census. We have used these figures rather than other estimates offered at trial because these are more complete.

3. At trial it was stated that the total Negro and non-white population in the new Sixth is about 5,300 out of a total population of about 419,000. According to these figures, the Negroes and non-whites would constitute 1.3% of the new Sixth.

ficient basis for a conclusion on our part that it was intentional and racially motivated. Furthermore, no inference whatsoever can be drawn from the changes that took place in Area C. It would be the height of unwarranted speculation for us to find that the Legislature removed over 15,000 persons for the sole purpose of excluding 384 Negroes from the new Sixth out of a total population of some 467,000.

The long color line extending along the southerly edge of the new district for some five miles, so stressed by plaintiffs on the trial as proof of intent consists of a solid concrete abutment upon which run the tracks of the Long Island Railroad and of several large thoroughfares. This situation makes for a logical geographic dividing line even as rivers so frequently divide States or Counties. Nor is it surprising in any large Metropolitan area to find along any broad or main artery that it may have become a dividing line between national or racial groups. Yet such a thoroughfare may be a logical line of demarcation.

Not only is there no injury allegedly suffered by virtue of the redistricting, but no conceivable reason for this purported discrimination against these plaintiffs has been suggested. This case is far different from Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed. 2d 110 (1962), urged by plaintiffs as a compelling precedent. As stated in Wright, supra:

"The Gomillion case has no application whatsoever. There some 400 Negro residents of the city of Tuskegee who were entitled to all the privileges of city residents including voting were deliberately disenfranchised from such voting by a wholly irrational drawing of new city boundaries which did not even slightly veil the obvious purpose of excluding Negroes as city voters."

In this instance the Negroes have been deprived of nothing; they have been moved from one district where Negroes represented 6% of the total population to another district having 23% Negroes. In substance, their claim is that the Legislature moved them to another district for no reason other than the fact that they were Negroes. Without intimating any view as to whether, if proven, this would state a cause of action under the Fourteenth Amendment, the absence of any material change in their rights, including their right to vote, negates the inference of racial discrimination that plaintiffs would have us draw.

Plaintiffs' second cause of action is a claim that Chapter 980 was designed to redistrict the entire state for the benefit of the Republican Party which has a majority in the State Legislature.[4] They offered the testimony of Senator Joseph Zaretski, the Minority Leader of the State Senate, to prove that the bill was passed without a public hearing and an opportunity for public debate. He also testified that although he was given a copy of the proposed legislation, he never had the opportunity to view a prepared map illustrating the district changes. Plaintiffs again point to changes in several specific districts, namely the new 1st in Suffolk County, the new 6th in Queens, the new 14th, 15th and 16th in Brooklyn and Richmond, the new 23rd and 24th in the Bronx, and the new 35th upstate as proof of legislative motive.

Chapter 980 was duly enacted by the requisite majority of the State Legislature.[5] There is no proof that the rules of the Legislature were not properly followed. Although a copy of a proposed bill normally must be submitted to the members three days before a vote, this is

---

4. Although not alleged in the complaint, plaintiffs are registered voters in the Democratic Party.

5. The vote in the State Senate was 33 to 25 in favor of the bill, all Senators voting strictly along party lines. The vote in the State Assembly was 76 to 61 in favor of the bill. Under the State Constitution, no bill can be approved in the lower house with fewer than 76 votes. Five Republicans in the Assembly voted against the bill.

not the case in an extraordinary session such as the one at which Chapter 980 was enacted. Neither is there any evidence that the majority was not aware of the substance of the bill before them. We think our inquiry as to this aspect of the second cause of action must end here.

Plaintiffs' other evidence on this cause of action suffers from the same deficiencies present in their first cause of action. One expert testified that he expected the redistricting to produce a new Congressional delegation from New York composed of between 24–26 Republicans and 15–17 Democrats as opposed to a 1960 Congressional delegation of 21 Republicans and 22 Democrats. This, in conjunction with the fact that according to 1961 registration statistics 44% of the registered voters in the state are Republicans, 50% are registered Democrats, and the other 6% are primarily Liberals, is purportedly proof of legislative discrimination against members of the Democratic party.

Plaintiffs also rely heavily on the changes in the new 6th as well as in the new 14th, 15th and 16th. The only proof offered with respect to revisions in the 23rd and 24th in the Bronx and the 35th upstate were maps illustrating these changes.

As to the new 6th, no figures were offered to show the breakdown in Republican and Democratic registration in that district prior to the redistricting. There was testimony that the new 6th is composed of approximately 52% registered Democrats and 48% Republicans. In the 1960 election, the incumbent Republican, Seymour Halpern, carried the district by 21,000 votes despite the fact that President Kennedy won by about 9,000 votes in the same district. All that can be said to be proven by these facts is that the people in the district voted on the basis of the individual candidate rather than on strict party lines.

The old 15th (now the new 16th) was composed of Staten Island and part of the Bay Ridge section of Brooklyn. Since Staten Island only has a population of some 231,000, some portion of the Long Island mainland had to be added to it in order to create a district comparatively equal in population to other state districts. Plaintiffs argue that the addition of a new section of Brooklyn near Jamaica Bay further removed from Staten Island than the old Bay Ridge section is proof of legislative intent. However, the evidence also showed that Staten Island is evenly divided among Republicans and Democrats and that the heavily Republican Bay Ridge area had enabled Republicans to elect a Congressman from that district for the last six terms. The new section is also evenly divided and apparently the change has converted what was formerly a relatively safe Republican seat into a closely contested one. It was argued that the reason for this change was a desire to move the Bay Ridge area into one of the other Brooklyn districts in order to make the new 15th more solidly Republican than the old 12th and to ensure at least one Republican seat in heavily Democratic Brooklyn.

The mere statement of these contentions makes obvious the tenuous nature of plaintiffs' proof. We are asked to wend our way through the streets of Brooklyn and across the Narrows to Staten Island and to conclude at the end of our journey that there is something unconstitutional lurking along the way. But the only thing we can be certain of is that a reduction in New York's Congressional seats was necessary, that the Legislature endeavored to create comparative equality of population in the state districts and that this was duly accomplished. Any other conclusion would be mere speculation. The process of prediction in the political area is fraught with difficulties, to which many unsuccessful candidates can most eloquently testify.[6]

The incalculable and imponderable factors that make up an individual's choice

---

6. Although not of legal significance, the advantages of hindsight makes it possible

to add an interesting historical footnote to this case. In the 1962 Congressional

as to how he will register his vote make certainty here an illusive object. We would require far more substantial evidence to warrant our intrusion into the political arena and to justify any action by the Court requiring the Legislature to revise these districts again.

Complaint dismissed.

election on November 11th, despite the dire predictions of so-called experts, 20 Democrats and 21 Republicans were elected to Congress from New York. In the newly created 1st District in Suffolk, a Democrat, Otis G. Pike, was elected by over 30,000 votes. Seymour Halpern was re-elected in the 6th District, this time by some 40,000 votes. The Democrats were victorious in a close election in the new 16th (Staten Island and a por-

tion of Long Island), as well as in the new 14th and 15th in Brooklyn. Incumbents Buckley (Democrat) and Fino (Republican) were elected by handsome majorities in the 23rd and 24th in the Bronx. A Democrat, Samuel Stratton, was elected in the new 35th upstate.