LESTER C. JONES *ET AL.*, PLAINTIFFS-APPELLANTS, v. ROBERT M. FALCEY, ETC., *ET AL.*, DEFENDANTS-RESPONDENTS. FRANK C. OSMERS, JR., *ET AL.*, PLAINTIFFS-INTERVENORS-APPELLANTS, v. ROBERT M. FALCEY, ETC., *ET AL.*, DEFENDANTS-RESPONDENTS. MURRAY S. ABOFF, *ET AL.*, PLAINTIFFS-INTERVENORS-APPELLANTS, v. ROBERT M. FALCEY, ETC., *ET AL.*, DEFENDANTS-RESPONDENTS.

Argued July 18, 1966—Decided July 23, 1966.

*Mr. Sidney P. McCord, Jr.,* argued the cause for intervenors-appellants Osmers, *et al* (*Messrs. McCord, Farrell, Eynon and Munyon,* attorneys).

*Mr. S. David Levy* argued the cause for intervenors-appellants Aboff, *et al* (*Messrs. Covine and Levy,* attorneys).

*Mr. Joseph A. Hoffman,* Assistant Attorney General, argued the cause for defendants-respondents (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. This case involves the constitutionality of the Congressional District Act (1966) (*c.* 156, as amended by *c.* 183). The prior statute had been found to be invalid in these proceedings. *Jones v. Falcey,* 88 *N. J. Super.* 273 (*Ch. Div.* 1965). The Legislature thereupon enacted the 1966 statute now before us. The trial court upheld it, and we certified the ensuing appeal before argument in the Appellate Division.

The population of the new districts and the percent of deviation from the mathematical ideal of 404,452, based upon the 1960 census, are:

| District | 1960 Population | Percent of Rel. Deviation |
| --- | --- | --- |
| 1 | 394,619 | —2.4 |
| 2 | 374,996 | —7.3 |
| 3 | 413,388 | +2.2 |
| 4 | 432,974 | +7.1 |
| 5 | 405,533 | +0.3 |
| 6 | 439,756 | +8.7 |
| 7 | 384,398 | —5.0 |
| 8 | 406,618 | +0.5 |
| 9 | 395,857 | —2.1 |
| 10 | 424,775 | +5.0 |
| 11 | 429,140 | +6.1 |
| 12 | 398,557 | —1.5 |
| 13 | 389,066 | —3.8 |
| 14 | 396,996 | —1.8 |
| 15 | 380,109 | —6.0 |

## I.

In devising the districts, the Legislature preserved 15 of the 21 county lines. Apparently none of the other competing plans in the legislative arena adhered to a greater number.

Six of the counties had population in excess of 404,452, the mathematical ideal.

Passaic County, which with 406,618, barely exceeded the ideal, was constituted a whole district (No. 8) and no one questions that legislative decision.

Bergen County, with 780,255, was divided into two whole districts, No. 7 and No. 9, with 384,398 and 395,857 respectively. The deviations from the ideal in percentages are —5.0 and —2.1. No one assails the deviations as excessive. Rather the sole complaint is that the line dividing Bergen County runs east and west whereas under the prior districting statute the line ran north and south. The change, it is charged, was made to gain a partisan political advantage. In short, the attack rests upon the premise that the Republican Party would have an edge if the line continued to run north and south, while the Democratic Party will likely do better under the line the new statute draws.

The 1960 census shows the population of Essex County as 923,545, the population of Hudson County as 610,734, and the population of Union as 504,255. As to them, county lines must be crossed because the deviation from the ideal would be too great if Essex were divided into either two or three whole districts, or if Hudson or Union were each either divided into two whole districts or treated as one.

The statute creates two whole districts within Essex County (No. 10, with a population of 424,775, involving a deviation of +5.0 from the ideal, and No. 11, with a population of 429,140 involving a deviation of +6.1). The remainder of Essex County is joined with a portion of Union County to form district No. 12, with a population of 398,557, and a deviation of —1.5. As to Essex County, the sole complaint is that the City of Newark, which had a population of

405,220 in 1960, should be constituted a separate district, whereas the statute places three wards of that city in the 10th district and the remaining two wards in the 11th.

As to Hudson County, the statute creates the 14th district with a population of 396,996, and a deviation of —1.8, and the remainder of that county is joined with a portion of Union County to constitute the 13th district with a population of 389,066, and a deviation of —3.8. The balance of Union County, and a portion of Essex County, constitute the 12th district, already mentioned above. As to this scene, the sole attack below was upon the joinder of the City of Elizabeth, the county seat of Union County, and two other contiguous municipalities of Union County with a portion of Hudson County. It is obvious that a portion of Hudson must be joined with some area, either in Bergen, Essex or Union. The complaint, while recognizing this inescapable fact, stresses two circumstances, to wit, that a bay lies between the City of Elizabeth and Hudson County and the present incumbent, who lives in Elizabeth, will be moved from a Republican stronghold to a district which will probably vote Democratic.

The trial court correctly rejected the several contentions we have just described with respect to the mode of division of Bergen County, the failure to constitute the City of Newark a separate district, and the joining of a portion of Union County with a part of Hudson County. It should be stressed that it is not charged that the resulting districts deviate from the population ideal. Rather, plaintiffs assume the mathematical integrity of the districts and contend that nonetheless the Court should find that the districts were improperly constituted because of partisan motivation.

The trial court described such issues as non-justiciable. Perhaps it would be more accurate to say such issues are beyond judicial condemnation, not because the controversy is beyond the jurisdictional authority of the Court, but rather because the Constitution does not prescribe a single approach or motivation for the drawing of district lines, and hence the Constitution is not offended merely because a partisan advan-

tage is in view. Indeed, it would be difficult to separate partisan interests from other interests, since partisan interests may well be but a summation of such other interests. In addition, it would seem impossible for a court to pass upon the validity of political interests without itself making a political judgment or appearing to do so. For these reasons the view generally taken in this new area of judicial activity is that, if the mathematics are acceptable, it rests with the voters, rather than the Court, to review the soundness of the partisan decisions which may inhere in the lines the Legislature drew. Actual experience of course may generate exceptions to that approach.

That partisan gerrymandering, the districts being mathematically acceptable, will not justify judicial condemnation was plainly stated in *WMCA, Inc. v. Lomenzo,* 238 *F. Supp.* 916 (*S. D. N. Y.* 1965). The United States Supreme Court affirmed the judgment in that case on motion, 382 *U. S.* 4, 86 *S. Ct.* 24, 15 *L. Ed. 2d* 2 (1965), and Mr. Justice Harlan, concurring in that case, said he took the Court's action to mean that "partisan 'gerrymandering' may [not] be subject to federal constitutional attack under the Fourteenth Amendment." We note that *Lomenzo* involved apportionment of a state legislature, and hence the reference to the Fourteenth Amendment, whereas the principle of equality of vote in congressional elections was found in *Wesberry v. Sanders,* 376 *U. S.* 1, 7, 84 *S. Ct.* 526, 11 *L. Ed. 2d* 481, 486 (1964), to stem from the command of *Article* I, § 2, that representatives be chosen "by the People of the several States." We see no difference, in this regard, between apportionment for State purposes and districting for federal purposes.

We note that both before and after *Lomenzo* the United States Supreme Court, after observing that "it might well be that, designedly or otherwise, a *multimember* constituency apportionment scheme, under the circumstances of a particular case, would operate to minimize or cancel out the voting strength of racial or *political elements* of voting population" (emphasis is ours), expressly withheld deciding the issue

those facts would raise. *Fortson v. Dorsey, 379 U. S. 433, 439, 85 S. Ct. 498, 13 L. Ed. 2d 401, 405 (1965)*, and *Burns v. Richardson, 383 U. S. 73, 86 S. Ct. 1286, 16 L. Ed. 2d 376, 388, 389 (1966)*. The question is whether that reservation, repeated in *Burns v. Richardson* after *Lomenzo*, suggests that too much has been read into *Lomenzo* with respect to the partisan gerrymandering. The quoted reservation seems to apply peculiarly and solely to the use of *multimember* constituencies, and apparently does not suggest a similar concern with respect to the location of lines of a single-member district. We add that the view expressed above with respect to the significance of *Lomenzo* has been taken in other cases as well. See *Meeks v. Avery, 251 F. Supp. 245, 250–251 (D. Kan. 1966)*; *Kilgarlin v. Martin, 252 F. Supp. 404, 432 (S. D. Tex. 1966)*; *Sims v. Baggett, 247 F. Supp. 96, 104–105 (M. D. Ala. 1965)*.

We have said that exceptions may well appear with experience. One has been suggested, namely, that lines may not be drawn on the basis of race, religion, or ancestry. See *Wright v. Rockefeller, 376 U. S. 52, 84 S. Ct. 603, 11 L. Ed. 2d 512 (1964)*; *Lomenzo, supra, 238 F. Supp.*, at *p. 926*. See also *Sims v. Baggett, supra, 247 F. Supp.*, at *pp. 104–105*. Although obviously it is difficult to prove an intent to district upon the basis of such factors, the exception seems nonetheless to be sound. Another limitation probably inheres in the very concept of a "district," that is, that it must embrace an area with a single set of boundaries rather than be a collection of geographically isolated oases.

These exceptions require a further comment upon the complaints already mentioned above. As to the division of the City of Newark, a charge was made that if Newark were constituted a single district, the political power of Negro voters in that district would be decisive, and hence the allocation of the city's wards within two districts dilutes their maximum possible impact. As to this, the short answer is that there is no proof that the Legislature intended to advantage or disadvantage any racial or ethnic group. The City of Newark is

wedded to the suburbs which, with it, make up Essex County. There are obvious reasons, wholly non-racial and non-ethnic, which readily explain a decision to include urban and suburban areas in each district. We may not assume the Legislature was moved by some other, insidious purpose.

As to the joining of Union County municipalities with a part of Hudson County, it is urged that the resulting district lacks internal contiguity because a bay, one mile wide, intervenes. The presence of a waterway does not spell out non-contiguity. The district does not jump over another district. Water is not only completely compatible with physical contiguity, but in fact it may spell out unity in respects which can bear rationally upon a legislative decision as to where to draw a line. Waterways mean commerce and here in fact there are identical economic interests on both sides of the bay, especially within the ambit of federal activities. The power to resolve such issues rests with the Legislature, and under our Constitution the legislators are accountable to the voters alone.

## II.

We turn to the second phase of the attack, which claims the deviations from the population ideal are beyond constitutional tolerance.

In *Wesberry v. Sanders, supra,* the United States Supreme Court said, 376 *U. S.,* at *p.* 7, 84 *S. Ct.,* at *p.* 530, 11 *L. Ed. 2d,* at *p.* 486:

"We hold that, construed in its historical context, the command of Art. I, § 2, that Representatives be chosen 'by the People of the several States' means that as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's. * * *"

The Court added, 376 *U. S.,* at *p.* 18, 84 *S. Ct.,* at *p.* 535, 11 *L. Ed. 2d,* at *p.* 492:

"While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal num-

bers of people the fundamental goal for the House of Representatives. That is the high standard of justice and common sense which the Founders set for us."

In *Reynolds v. Sims,* 377 *U. S.* 533, 577–578, 84 *S. Ct.* 1362, 12 *L. Ed.* 2d 536–537 (1964), which involved apportionment for State legislative purposes, the court recognized the propriety of giving effect to political subdivisions in drawing district lines, whether the districts be for federal or State legislative purposes, even though "it may be feasible to use political subdivision lines to a greater extent in establishing state legislative districts than in congressional districting." The Court explained that "indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." As we have already noted, partisan gerrymandering is beyond effective judicial review, and hence the constitutional wisdom of permitting deviations from the mathematical ideal if such lines are used in fixing the districts.

While permitting some deviation to give effect to political subdivisions, *Reynolds v. Sims* expressly states that economic or other group interests will not justify departures from the mathematical ideal, saying, 377 *U. S.,* at *pp.* 579–580, 84 *S. Ct.,* at *p.* 1391, 12 *L. Ed.* 2d, at *pp.* 537–538:

"* * * But neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes. Considerations of area alone provide an insufficient justification for deviations from the equal-population principle."

Here the Legislature adhered to county lines as to 15 of the 21 counties, and where it did so, the deviations are, in our view, constitutionally tolerable. The largest such deviations run —7.3 and +7.1 and occur respectively in the 2d district (population 374,996) which comprises Atlantic, Cape May, Cumberland and Salem Counties, and the 4th district (population 432,974) which comprises Mercer, Hunterdon,

Warren and Sussex Counties. These deviations are permissible in view of the objective of adhering to county lines, but we can find no comparable justification for some of the deviations where county lines are broken and the mathematical ideal could be more nearly approached by redeployment of whole municipalities lying at the borders of the districts.

■■ In seeking to defend deviations in the circumstances we have just described, it is argued that the percent of deviation is less (or more, say the opposition) than percentages sustained in other cases. We see no validity in that approach. *Cf. Calkins v. Hare,* 228 *F. Supp.* 824, 828 (*E. D. Mich.* 1964). The Constitution, as construed in *Wesberry* and *Reynolds,* does not contemplate that there is a range of deviation within which a State may maneuver, with or without reason. On the contrary, the command is to achieve equality, and a limited deviation is permissible only if there exists an acceptable reason for the deviation. So, a limited deviation may be acceptable if it is needed to stay with the lines of existing political subdivisions and thus to avoid the spectre of partisan gerrymandering. But the deviation may not exceed what the purpose inevitably requires. In other words, the command is to achieve population equality "as nearly as practicable," and if equality would be more nearly achieved by shifting whole municipalities to a contiguous district, the draftsman has not achieved equality "as nearly as practicable," unless some other constitutionally tenable reason (if there is any) can be shown to justify the disparity. If the lines of political subdivisions are ignored, there is no apparent reason for not achieving mathematical equality, subject of course to inevitable *de minimis* variations. See *Meeks v. Avery, supra,* 251 *F. Supp.,* at *p.* 251.

There are three situations which raise the problem. We mentioned above that there are six counties with populations in excess of the mathematical ideal. We named five of them. The last is Middlesex County, with a population in 1960 of 433,856. The statute constitutes the bulk of Middlesex County the 15th district with a population of 380,109 and a deviation

of —6.0. Three municipalities in Middlesex County are made part of the 3d district, which district has a population of 413,388 and a deviation of +2.2. The three municipalities and their populations are the Township of Madison, 22,772, the Borough of Sayreville, 22,553, and the City of South Amboy, 8,422. Plaintiffs say that all of Middlesex should constitute a single district. We see no constitutional imperative for that treatment. Rather a different problem exists, and it arises from the fact that if Sayreville and South Amboy were retained in the 15th district, the deviations from the mathematical ideal would be less and there would be adherence to the basic objective of the statute to stay with county lines as far as practicable.[1] In other words, the two municipalities were not separated from Middlesex County for the purpose of advancing the constitutional requirement of equality.

The same problem arises with respect to the 1st and 6th districts. The 1st district consists of all of Gloucester County and most of Camden County, the remainder of Camden County being part of the 6th. The 1st district has a population of 394,619, with a deviation of —2.4, while the 6th district has a population of 439,756, and a deviation of +8.7. The following Camden municipalities are part of the 6th district:

|  | *Population (1960)* |
|---|---|
| Borough of Audubon | 10,440 |
| Borough of Collingswood | 17,370 |
| Township of Cherry Hill | 31,522 |
| Township of Haddon | 17,099 |
| Borough of Haddonfield | 13,201 |
| Borough of Merchantville | 4,075 |
| Borough of Oaklyn | 4,778 |
| Township of Pennsauken | 33,771 |

---

[1] As the statute stands, the 15th district has a population of 380,109 and the 3d district has a population of 413,388. If Sayreville and South Amboy are retained in the 15th district, that district will have a population of 411,084 and the 3d district a population of 382,413.

The disparity was indeed aggravated by the amendatory statute, c. 183, which moved Audubon and Oaklyn from the 1st district, with a deviation prior to the amendment of +1.3, to the 6th with a deviation prior to the amendment of +5. Plaintiffs complain also that the residence of the present incumbent is moved from the district he now represents to the 6th district. As to this, we repeat that the Constitution does not protect incumbents, leaving the review of such action to the electorate alone. *Cf. Kirby v. Illinois State Electoral Board,* 251 *F. Supp.* 908, 909 (*N. D. Ill.* 1965). We are concerned solely with the deviations within the two districts, and as to this, we note that 50 percent of the combined population of the districts is 417,187 and that that figure could be approached by moving abutting whole municipalities to the 1st district.

A third situation, not specified by the parties but equally involved in the issue we are discussing, pertains to the 10th district (population 424,775; deviation of +5.0), the 11th district (population 429,140; deviation +6.1), and the 12th district (population 398,557; deviation of —1.5). Parts of Essex County are within each of these districts. The Township of Cedar Grove, located in the 10th district, has a population of 14,603 and abuts the 12th district. The Borough of Verona, located in the 11th district, has a population of 13,782, and also abuts the 12th district. If either of those municipalities is moved to the 12th district, that district and the district from which the municipality is moved will, as between them, come closer to the populaton ideal. If the adjustment is made between the 10th and the 12th districts, they would have populations of 410,172 and 413,160, and if the adjustment were made between the 11th and the 12th districts, their populations would be 415,358 and 412,339. Under the circumstances either move would be constitutionally acceptable.

The record contains no explanation for any of the deviations described above. The Attorney General says we should assume that adequate reasons do exist, in the absence

of proof excluding them. We cannot accept that approach, for here, upon the face of things, the constitutional command for equality of representation has been breached. As the record stands, unconstitutionality appears affirmatively. Where a deviation results from adherence to the lines of political subdivisions, the reason is evident, and if the deviation is not excessive, a court can find the deviation is defensible. But where the deviation obviously exceeds that needed to permit the use of the lines of political subdivisions, the deviation spells out unconstitutionality, and a court must so hold unless the record affirmatively reveals a tenable basis for the legislative action. See *Calkins v. Hare*, 228 *F. Supp.* 824, 827 (*E. D. Mich.* 1964) ; *Drum v. Seawell*, 250 *F. Supp.* 922 (*M. D. N. C.* 1966), affirmed without opinion, 383 *U. S.* 831, 86 *S. Ct.* 1237, 16 *L. Ed. 2d* 298 (1966) ; but see *Kilgarlin v. Martin*, 252 *F. Supp.* 404, 412 (*S. D. Tex.* 1966).

■ In view of the importance of this litigation, the cause should be remanded to permit the parties to pursue it under the guidelines of this opinion. It is difficult to conceive of any reason for a deviation beyond that required to follow the lines of a whole political subdivision, especially in view of the statements we have quoted from *Reynolds v. Sims*, but the parties should be permitted to advance whatever considerations they think will suffice.

## III.

■ The remaining question is whether the election scheduled for this November should be permitted to be held under the 1966 statute notwithstanding the views expressed in "II" above. In the light of the remand, the litigation has not run its course. Further, the alternatives are not inviting. An election at large would deny the citizens the opportunity for representation by districts, the long established course in our State. Nor would it be fitting to permit an election under the statute already adjudged invalid by the trial court, as an intervenor urges us to do. That statute is far more distant

from the constitutional goal than is the statute before us. Indeed, the deviations in the present statute, although indefensible on the present record, are not tremendous. Time being too short for a more satisfactory solution, we think the judiciary should withhold its hand to the end that the forthcoming election may be held under the 1966 statute, as amended. See *Drum v. Seawell, supra,* 250 *F. Supp.,* at *p.* 925, affirmed without opinion (and perhaps without reference to the issue at hand), 383 *U. S.* 831, 86 *S. Ct.* 1237, 16 *L. Ed. 2d* 298. The results of that election will stand, notwithstanding the ultimate fate of the statute on the remand, but of course, if the statute is ultimately found to be invalid, no further election could be held under it.

The judgment is reversed and the matter remanded for further proceedings not inconsistent with this opinion. No costs.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance* — None.