David I. WELLS and Donald S. Harrington, Individually and as Acting Chairmen of the State Committee of the Liberal Party of the State of New York, Plaintiffs,

v.

Nelson A. ROCKEFELLER, as Governor of the State of New York, Louis J. Lefkowitz, as Attorney General of the State of New York, John P. Lomenzo, as Secretary of State of the State of New York, Malcolm Wilson, as Lieutenant Governor of the State of New York, and Presiding Officer of the Senate of the State of New York, and Anthony J. Travia, as Speaker and Presiding Officer of the Assembly of the State of New York, Defendants.

No. 66–Civ.–1976.

United States District Court
S. D. New York.

May 10, 1967.

Judgment Affirmed Dec. 18, 1967.
See 88 S.Ct. 578.

Isidore Levine, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen. of New York, Albany, N. Y. (George D. Zuckerman, Asst. Atty. Gen., of counsel), for defendants.

Before MOORE, Circuit Judge, and MacMAHON and CANNELLA, District Judges.

MOORE, Circuit Judge.

Plaintiffs, David I. Wells and Donald S. Harrington, individually and as Acting Chairmen of the State Committee of the Liberal Party of the State of New York, bring this action against Nelson A. Rockefeller, as Governor of the State of New York, the Attorney-General, the Secretary of State, the Lieutenant Governor and Presiding Officer of the Senate, and the Speaker and Presiding Officer of the Assembly, and pray for judgment:

(1) that Article VII, Section 111, Chapter 980 of the Laws of 1961 (New York) is void and invalid as contrary to Article I, Section 2 of the United States Constitution;

(2) that alleged existing Congressional malapportionment deprives plaintiffs (a) of their rights without due process of law, and (b) of equal protection of the laws as guaranteed by the Fourteenth Amendment of the United States;

(3) that the Governor be restrained from certifying votes for the election of representatives from the Congressional Districts established under Chapter 980;

(4) that the Attorney-General, and the Secretary of State be restrained from enforcing various election procedures pursuant to said Chapter; and

(5) that the Presiding Officer of the Senate and the Speaker of the Assembly be directed to take such action as may be necessary to comply with the United States Constitution.

Jurisdiction is asserted under the Fourteenth Amendment of the United States Constitution and under 42 U.S.C. §§ 1983, 1988 and 28 U.S.C. § 1343(3). Declaratory relief is sought under 28 U.S.C. §§ 2201, 2202 and 2281 et seq.

Upon plaintiffs' motion, a three-judge court was convened to hear the issues presented. Before this court, plaintiffs now seek a summary judgment declaring Article VII, Section 111, Chapter 980 unconstitutional. Also before us is defendants' motion to dismiss the complaint.

*The Statute Attacked as Invalid*

Prior to the enactment of Chapter 980 (L.1961), Congress, acting upon the 1960 decennial census figures, reduced the number of New York's congressional districts from 43 to 41. Chapter 980 was enacted to establish the boundary lines of these 41 districts. At the time during which it was engaged in the task of reapportionment, the Joint Legislative Committee on Reapportionment did not have the advantage of the various rather recent decisions of the Supreme Court on the subject. Little purpose, therefore, will be served by commenting at this date on the Committee's arithmetic and geographic thinking in endeavoring to achieve such reapportionment because the ten (10%), fifteen (15%) (this figure the Committee selected as a maximum) and twenty (20%) percent variations considered by the Committee are now quite outmoded. Basically, however, the Committee did divide the population of the State into 41 parts which produced a hypothetical population figure of 409,-326 per part. It then separated New

York City with its population of 7,781,-984 from the rest of the State. Assigning 19 districts to New York City, an average population per district of 409,-578 resulted. The average for the other 22 districts was 409,109 per district. Thus, the equality of population in these areas, New York City and upstate on this grouping basis (19 and 22) is truly remarkable, and should satisfy the most population-minded court. However, in arriving at boundary lines for these 41 districts, the Legislature soon discovered that the problem was more difficult than one of long division on a classroom blackboard. Before legislative agreement was reached, the districts assumed designs of which a jigsaw puzzle artist would have been proud and which had very substantial population disparities. These disparities plaintiffs now attack and, in support of their position, cite many recent Supreme Court decisions in addition to Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), as establishing population equality as the only guide in reapportionment.

The defendants (collectively referred to as the State) claim that the constitutionality of Chapter 980 has been sustained twice by three-judge courts, and that dismissals of the complaints in Wright v. Rockefeller, 211 F.Supp. 460 (S.D.N.Y. 1962) and in Honeywood v. Rockefeller, 214 F.Supp. 897 (E.D.N.Y.1963) have been afffirmed by the Supreme Court, Wright v. Rockefeller, 376 U.S. 52, 84 S.Ct. 603, 11 L.Ed.2d 512, rehearing denied, 376 U.S. 959, 84 S.Ct. 964, 11 L.Ed. 2d 977 (1964), and 376 U.S. 222, 84 S.Ct. 708, 11 L.Ed.2d 656 (1964), respectively.

To test the validity of the State's claim, the issues presented in these cases must be analyzed. In *Wright,* supra, although population inequalities among the 17th, 18th, 19th and 20th Congressional districts were before the court, the plaintiffs there stressed an alleged segregation of eligible voters by race and place of origin and charged that the 17th district was contrived to exclude non-whites and Puerto Ricans, whereas the 18th, 19th and 20th districts were drawn so as to include large numbers of this group. The basis for the majority decision was a failure of proof that the Legislature had fixed the boundaries of these districts along racial lines. The grounds for affirmance by the Supreme Court make such failure of proof quite explicit. Mr. Justice Black specifically stated that there was no showing "that the challenged part of the New York Act was the product of a state contrivance to segregate on the basis of race or place of origin." Conversely, the Justice said that the court was not passing on the question "whether the state apportionment is constitutionally invalid because it may fail in its objective to create districts based as nearly as practicable on equal population," referring to Wesberry v. Sanders, decided at the same time. 376 U.S. at 58, 84 S.Ct. at 606.

In *Honeywood,* supra, the burden of the complaint was the alleged purposeful exclusion, by changing the old Fourth Congressional district into the new Sixth, of 75–80% of the Negro population residing in the old Fourth. Here again, the dismissal of the complaint was based primarily on failure of proof of any such legislative intent. Affirmance by the Supreme Court was based upon *Wright.*

It is thus clear beyond a doubt that neither *Wright* nor *Honeywood* dealt with population disparities. Nor can they be made a sound basis for an argument that the constitutionality of the present Congressional districting statute has been sustained by these decisions.

*The Complaint*

Turning now to the present complaint, the court for purposes of the summary judgment motion accepts the 1960 census figures set forth therein to illustrate the disparities complained of. Using a State average of 409,324 per district, the 12th district (part of Kings County) has a population of 471,001 or 15.1% above average, whereas an adjoining district, the 15th (also part of Kings County), has a population of 350,635 or 14.4% below average—a spread between these two contiguous districts of 29.5%. From a

population standpoint, there are six districts over 10% above average (452,826 to 471,001) and seven districts over 10% below average (350,635 to 361,067). The difference between the 12th (471,001) and the 15th (350,635) becomes the more curious because they are both in Kings County and contiguous. Were the populations of these two districts added and divided by two, a figure (410,818) very close to the State average would result, albeit the boundary lines of the two districts would have to be changed to achieve such equalization.

Another situation of interest exists as to Staten Island (Richmond County), a part of the 16th district. Because of insufficient population on Staten Island to constitute a Congressional district, a segment located on the side of Jamaica Bay was added. There is no way of reaching this segment of the 16th without traversing other districts or proceeding by sea. Closest to Staten Island and now connected by the Verrazzano Bridge is the Brooklyn shore but this area currently is the 15th district. The 14th district also consists of two areas connected solely by a thin uninhabited strip between the waterfront and the Brooklyn-Queens Expressway.

In view of the conclusion reached in this opinion, further comments by the court on the seemingly bizarre structure of the present Congressional districts is unnecessary, first, because in the required redistricting, many of the problems raised by the existing lines may well become academic and, second, because the creation of district lines is, and should be a legislative and not a judicial function, unless, of course, the Legislature creates districts which offend constitutional guaranties.

The complaint also alleges that the district lines were drawn to discriminate in favor of the Republican Party. No proof has been offered to establish this point (*Wright*, supra; *Honeywood*, supra); hence, it is unnecessary to pass upon its legal sufficiency. However, the Supreme Court in New Jersey did find that "the Constitution is not offended merely because a partisan advantage is in view," Jones v. Falcey, 48 N.J. 25, 222 A.2d 101, 105 (1966) and in WMCA, Inc. v. Lomenzo, 238 F.Supp. 916 (S.D.N.Y. 1965) aff'd on motion Screvane v. Lomenzo, 382 U.S. 4, 86 S.Ct. 90, 15 L.Ed.2d 15 (1965), the court said that Fortson v. Dorsey, 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965) "makes is clear that the Supreme Court has refrained from condemning partisan gerrymandering as unconstitutional." (238 F.Supp. p. 926).

*The Law*

Since the broad principles established by Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), two rules applicable to congressional districts have emerged. First, substantial equality of population among districts in any state is required. Second, there is a burden on the proponent of any districting plan to justify deviations from equality.

I. The first principle stems from Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), namely, that the command of Art. I, § 2 of the United States Constitution "means that as nearly as practicable one man's vote in a congressional election is to be worth as much as another's." (p. 8, 84 S.Ct. p. 530). To achieve this purpose, the Supreme Court held that "While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives." (p. 18, 84 S.Ct. p. 535). Conversely, the Court was unwilling to hold that "legislatures may draw the lines of congressional districts in such a way as to give some voters a greater voice in choosing a Congressman than others." (p. 14, 84 S.Ct. p. 533).

*Wesberry* was soon followed by Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), in which, although it was a State legislative apportionment case, the Court stated specifically that in *Wesberry* it had "deter-

mined that the constitutional test for the validity of congressional districting schemes was one of substantial equality of population among the various districts established by a state legislature for the election of members of the Federal House of Representatives." 377 U.S. at 559, 84 S.Ct. at 1380.

After alluding to the differences in the application of the equality rule to state legislative as contrasted with congressional districts, the Court gave the definite pronouncement that - "*Wesberry* clearly established that the fundamental principle of representative government in this country is one of equal representation for equal numbers of people, without regard to race, sex, economic status, or place of residence within a State." Ibid. at 560–561, 84 S.Ct. at 1381.

Such expressions as "as nearly as practicable" and "substantial equality" were bound to give rise to various interpretations.

To the court in Calkins v. Hare, 228 F.Supp. 824, 828 (E.D.Mich.1964), even a "small percentage of the entire voting population" had a right to vote equally with others, "no matter what percentage of the total they comprise."

In Preisler v. Secretary of State *(Preisler II),*[1] 257 F.Supp. 953, 975 (W.D.Mo.1966), aff'd per curiam sub nom. Kirkpatrick v. Preisler, 385 U.S.

450, 87 S.Ct. 613, 17 L.Ed.2d 511 (1967), the court interpreted the Supreme Court's rulings subsequent to *Wesberry* in Drum v. Seawell, 383 U.S. 831, 86 S.Ct. 1237, 16 L.Ed.2d 298 (1966), affirming per curiam, 249 F.Supp. 877 (M.D.N.C.1965),[2] and in Alton v. Tawes, 384 U.S. 315, 86 S.Ct. 1590, 16 L.Ed.2d 586 (1966), affirming per curiam, Maryland Citizens Committee for Fair Congressional Redistricting, Inc. v. Tawes, 253 F.Supp. 731 (D.Md.1966),[3] as holding that "population alone is the sole standard for congressional redistricting."

In Bush v. Martin (Bush II), 251 F. Supp. 484, 497 (S.D.Tex.1966),[4] the court equated the "as nearly as practicable" in *Wesberry* (congressional) with the "substantial equality" of *Reynolds* (state legislative) and noted the comment in *Reynolds* that "Mathematical exactness or precision is hardly a workable constitutional requirement." (377 U.S. at 577, 84 S.Ct. at 1390). The court in *Preisler II,* disagreeing with the *Bush II* approach, refused to follow it. 257 F. Supp. at 979.

At this juncture came the decisions of the Supreme Court on January 9, 1967, which we regard as determinative of the issues here. Although Swann v. Adams *(Swann III)*, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967),[5] involved the redistricting of Florida's legislature, the

---

1. *Preisler II* is a sequel to Preisler v. Secretary of State, 238 F.Supp. 187 (W.D.Mo.1965), a case in which the 1961 Congressional Redistricting Act of Missouri was declared unconstitutional. In *Preisler II*, the same plaintiffs succeeded in striking down Missouri's 1965 Congressional Redistricting Act.

2. Prior to the Supreme Court's affirmance, the District Court held unconstitutional the North Carolina Congressional Redistricting Act passed by the state legislature pursuant to the 1965 decree, but stayed its mandate, allowing the Redistricting Act to govern the 1966 congressional elections only. 250 F.Supp. 922 (1966).

3. The District Court adopted its own redistricting plan following two unsuccessful attempts by the Maryland legislature to enact constitutional congressional re-

districting plans. See earlier decisions. 228 F.Supp. 956 (D.Md.1964) and 226 F.Supp. 80 (D.Md.1964).

4. In Bush v. Martin *(Bush I),* 224 F. Supp. 499 (S.D.Tex.1964), aff'd per curiam, 376 U.S. 222, 84 S.Ct. 709, 11 L. Ed.2d 956 (1964), the District Court declared the Texas congressional districting statute unconstitutional. *Bush II* declared the 1965 Texas Congressional Redistricting Act to be valid for a limited period of time, leaving it for the 1967 Texas legislature (itself reapportioned) to correct the deficiencies of the 1965 Act.

5. This represents the third time this case has been before the Supreme Court. In 1964, the Supreme Court in Swann v. Adams (I), 378 U.S. 553, 84 S.Ct. 1904, 12 L.Ed.2d 1033, reversed the judgment of a three-judge District Court, Sobel

opinion of the Court is applicable (actually *a fortiori*) to congressional districts. The deviations in districts in *Swann III* were substantial, 15% above average in one, 14% in five and more than 10% in six. To us, it seems highly significant that the Supreme Court did not renounce all considerations other than absolute mathematical equality. On the contrary, it specifically adverted to the justifiable variations from a pure population standard and mentioned as possible justifications "integrity of political subdivisions, the maintenance of compactness and contiguity in legislative districts or the recognition of natural or historical boundary lines," as set forth in *Reynolds*, 377 U.S. at 579, 84 S.Ct. at 1390, 1391. Such an interpretation of *Reynolds* was wholly consistent with a "rule of reason" in reapportionment matters. The alternative would have been abject judicial surrender of jurisdiction to the mindless computer.

The significance of *Swann III* in congressional district cases is disclosed in the Court's brief "Per Curiam" (also January 9, 1967) in Duddleston v. Grills, 385 U.S. 455, 87 S.Ct. 611, 17 L.Ed.2d 508, wherein the Court vacated the lower court's approval of a redistricting plan (Indiana) [6] and remanded the case "for further consideration" in the light of *Swann III*, *Wesberry* and *Reynolds*. *Preisler II*, declaring Missouri's reapportionment unconstitutional, was affirmed, 385 U.S. 450, 87 S.Ct. 613, 17 L.Ed.2d 511. Thus, in summary, the Supreme Court's current views appear to be that the "equal population principle" applies to congressional districts—unless—. The

"unless" gives rise to the second principle.

II. The second principle is found in *Wesberry*, *Reynolds* and the January 9, 1967 decisions, and is that if there be any deviation from equality of population, the burden is on the State or other proponent to justify the deviation. In *Swann III*, the Court reversed "for the failure of the State to present or the District Court to articulate acceptable reasons for the variations among the populations of the various legislative districts * * *." There was "no attempt to explain or justify the many variations * * *." The Court cited with approval the statement in *Maryland Citizens*, supra, 253 F.Supp. at 733, that there was no showing that the variation was "unavoidable or justified upon any legally acceptable ground." Thus, the Court does not close the door to disparity provided it be slight and provided it be justified on a "legally acceptable ground."

It is too clear for debate that the present Act, creating the undisputed disparities in New York's congressional districts, violates constitutional requirements as enunciated by the Supreme Court. On the basis of population inequality alone, the Act fails to meet constitutional standards. Thus, reapportionment is required.

Despite the fact that "congressional apportionment is essentially a legislative function," *Bush II*, supra, 251 F.Supp. at 517, certain precepts to be found in the Supreme Court opinions should be noted. The congressional districts (the

v. Adams, 214 F.Supp. 811 (S.D.Fla. 1963), upholding the then current legislative apportionment in Florida and remanded the case for further proceedings.

In 1965 the Florida legislature adopted a new plan which the District Court declared unconstitutional, but approved on an interim basis for a period ending 60 days after the adjournment of the 1967 session of the Florida legislature.

In Swann v. Adams (II), 383 U.S. 210, 86 S.Ct. 767, 15 L.Ed.2d 707 (1966), the Supreme Court again reversed the District Court, finding the waiting period to be too long and remanded so that a valid

reapportionment plan might be enacted for the 1966 elections.

In March of 1966, the Florida legislature enacted yet another legislative reapportionment plan, which plan the District Court upheld, 258 F.Supp. 819 (S.D.Fla. 1965). In *Swann III* the Supreme Court reversed the District Court for the third time, finding unjustified, impermissible population variances between districts.

6. The lower court decision was Grills v. Branigin, 255 F.Supp. 155 (S.D.Ind. 1966).

geographic units) should be contiguous and as symmetrical as possible. The districts should be established "without regard to race, sex, economic status, or place of residence within a State," (*Reynolds,* 377 U.S. at 561, 84 S.Ct. at 1381) so that "[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote— whatever their race, whatever their sex, whatever their occupation, whatever their income, and wherever their home may be in that geographical unit." Gray v. Sanders, 372 U.S. 368, 379, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963). Although political considerations *per se* do not create an unconstitutional apportionment, political history teaches the lesson that there are political changes in practically all areas from time to time. No district can be regarded as the private preserve for any present incumbent if it offends the equality of population principle. Even if radical changes have to be made to meet the constitutional test, there will always be available leaders in every district who will be able to vie for the favor of their electorate. As long as these leaders collectively represent substantially equal numbers of a State's population, constitutional requirements would appear to have been met.

### The Remedy
#### Time Table

In Swann v. Adams *(Swann II),* 383 U.S. 210, 86 S.Ct. 767, 15 L.Ed.2d 707 (1966), the Supreme Court, referring to litigation commenced in 1962, wherein it had remanded the case in 1964 for further proceedings in the light of *Reynolds* and related cases, 378 U.S. 553, 84 S.Ct. 1904, 12 L.Ed.2d 1033 (1964) said, "The effect of the District Court's decision is to delay effectuation of a valid apportionment in Florida until at least 1969. [1965 plan held unconstitutional by District Court but approved provisionally up to 60 days after adjournment of 1967 session of Florida legislature.] While recognizing the desirability of permitting

the Florida Legislature itself to determine the course of reapportionment, we find no warrant for perpetuating what all concede to be an unconstitutional apportionment for another three years." The Court (February 25, 1966) remanded "so that a valid reapportionment plan will be made effective for the 1966 elections." 383 U.S. at 212, 86 S.Ct. at 768.[7]

In *Preisler II,* the District Court (August 5, 1966), under threat that if the 1967 legislature did not comply "with the clear commands of both the Constitution of Missouri and the Constitution of the United States," indicated that "the inevitable and totally predictable result" would be that the court would decree an "at large" election for Missouri's ten Congressmen. Proper respect for the equally constitutional division of our government into legislative, executive and judicial branches causes us to refrain from any *in terrorem* or declaratory and anticipatory comments. Nevertheless, the action taken by these courts is indicative that unreasonable delay will not be tolerated.

We are not inclined, tempting though it be, to play a game of redistricting chess wherein we would move towns and counties from one district to another until our conception of substantial equality would be achieved. Nevertheless, the thoughtful and well-reasoned opinion of the New Jersey Supreme Court suggesting this approach in Jones v. Falcey, supra, is indicative not only of a desire of the courts to be helpful but also of a willingness to disclose the various possibilities which might lead to constitutional success. Only failure, willful or otherwise, to heed the Supreme Court's mandates, could have led to the Roman numbers I, II and III, after the names of the cases cited herein which have resulted in constitutional rejection.

The New York legislature will reconvene in January 1968, unless it is called into special session earlier. Despite the many problems involved, there would seem to be no insuperable difficulty in

---

7. See note 5, supra.

making adjustments substantially to equalize the 41 congressional districts. Plaintiffs have submitted (Exhibit C to complaint) "A Possible Arrangement of New York State Congressional Districts under which No District Would Deviate in Population by more than 4.7% from State Average." They recognize that it is only a "possible" arrangement. As the many exhibits in the many reapportionment cases demonstrate, there are always a host of proffered solutions. The decision lies with the legislature. We note, however, the fact that there are six pairs of adjacent districts (five of the six in Kings County) with a population difference of over 100,000 and five such districts with a difference of between some 60,000 and 75,000 suggests a partial solution. There are also districts where the transferral of a single county as a unit to an adjacent district would greatly lessen the present district disparity.

The time table problem is seriously affected by the necessity for reasonably accurate population statistics. Presumably most, if not all, calculations in the various cases have been based on the 1960 United States census. There will not be another census until 1970. Assuming the figures will be available in 1971 and the number of seats allotted to New York is known, the earliest Congressional election under the new districts would be 1972.

Had the population remained static, the court could specify the 1960 census as a base. However, no court should blind itself to the world of today. To use 1960 figures in many areas would be to enforce the disparity of which plaintiffs complain. The population changes in Staten Island (Richmond County) since the opening of the Verrazzano Bridge and the influx into Nassau and Suffolk Counties particularly in the industrialized areas have been substantial.

Accuracy would call for a decree which would be based upon the 1970 census, knowledge of the number of congressional seats, and the immediate enactment in 1971 of a constitutional Act based upon the Supreme Court mandates, which Act would apply to the 1972 election of congressmen and which would retain jurisdiction in this court as a forum before which the litigants could press alleged failures to proceed. Against this approach is the Supreme Court's impatience on February 25, 1966, in *Swann II*, supra, directing a valid plan for the 1966 elections. This followed that Court's remand on June 22, 1964 (*Swann I*, 378 U.S. 553, 84 S.Ct. 1904, 12 L.Ed.2d 1033) for reapportionment according to *Reynolds* and related cases. The 1965 Florida Legislature reapportioned but, as previously mentioned, the Supreme Court thought that the District Court, despite its declaration of unconstitutionality, was too liberal in giving the 1967 Legislature an opportunity to create a proper plan, and remanded for a plan effective for the 1966 elections. The 1966 Legislature tried again. This time the District Court held the plan to be constitutional. But the 30% (Senate) and the 40% (House) variations were too much of a strain for "as nearly as practicable" and "substantial equality" and again the Supreme Court reversed. Presumably, the 1968 Legislature will produce a plan.

Little guidance or help comes from these precedents. The easiest (for the court) solution is merely to direct the New York Legislature in 1968 to produce a constitutional plan. Let them use any available population figures they can muster; let them divide the State into 41 substantially equal parts, provided they be reasonably compact and contiguous. Let them deliberate as free and independent legislators so long as they do not allow considerations of race, sex, economic status or politics to cross their minds. Then, when their handiwork is complete and is presented to us, we will have an opportunity to tell them whether they have articulated acceptable reasons for such variations as may exist. With judicial guidelines as definite as they now are, our opinion of approval or disapproval should be filed before 1969 with Supreme Court summary action by early 1970.

Just as litigants seek compromises as the most expedient, if not the best, solu-

tion, so not infrequently the courts. Acting upon the assumption that accurate congressional representation (1972–1982) must await the 1970 census and upon the Supreme Court's understandable objection to protracted delay, a compromise may be in order. The 1968 and 1970 (even possibly the 1972) congressional elections ought to be held in districts far more equalized than they are at present. There are enough changes which can be superimposed on the present districts to cure the most flagrant inequalities. Furthermore, these changes may well survive the 1970 census and any alteration in number of seats. This hope may serve to dispel the objection: is it worthwhile to disarrange the present districts just for two (at most three) elections? Any rearrangement, of course, may be disturbing to the present incumbent. But no incumbent has a vested life interest in any fixed territory. Nor should any successor look forward to such a right. It is the people who are entitled to his enclave. If the districts are rearranged on a more equal basis, the court will take judicial notice that there will be no dearth of congressional candidates from each district, seeking by their voter blandishments to assure their prospective constituents that they will give them the best possible representation.

Therefore, although not unmindful of the risks and disturbances attendant to change, the court assumes this risk. Laws insofar as possible should not be retroactive. To declare that the acts of Congressmen and State legislators might have been tainted with illegality merely because they were elected from districts which we now hold fail to conform to constitutional requirements would be most unwise. Nor would such a holding advance plaintiffs' cause. We can, and do, say, however, that a plan must be created by the 1968 Legislature which will provide for congressional districts in conformity with the Supreme Court's precepts so that the people of the State of New York may vote for their congressmen from such districts in the 1968 congressional elections. In so directing,

we are following the pattern set by the Supreme Court in *Swann II,* supra, and in Duddleston v. Grills, 385 U.S. 455, 87 S.Ct. 611, 17 L.Ed.2d 508 (1967).

It is not for this court to dictate to the Legislature the methods whereby substantial equality is to be attained. It may be suggested, however, that population statistics as of December 31, 1966, might well be capable of reasonable ascertainment from various sources to which the Legislature would have access. Such current figures should tend to reflect the radical population changes in the areas where such changes have occurred. In the stable and rather static metropolitan districts, particularly in New York City where there are to be found many examples of the greatest disparity, 1960 census figures could be used. Even if perfection cannot be achieved between now and 1973, improvement is worth the effort.

This court retains jurisdiction of this action so that the parties hereto may in the future apply for such relief as may be warranted.

Settle judgment on notice.