Joseph F. PARELLA et al.

v.

Joseph A. MONTALBANO, in his official capacity as President of the Rhode Island Senate et al.

No. 2003–595–Appeal.

Supreme Court of Rhode Island.

June 9, 2006.

Karen A. Pelczarski, Esq., Providence, for Plaintiff.

John A. Tarantino, Esq., Providence, for Joseph A. Montalbano, in his capacity as President of the R.I. Senate.

Normand G. Benoit, Esq., Providence, for William J. Murphy, in his capacity as the Speaker of the R.I. House of Representatives.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This appeal requires the Supreme Court to pass upon the constitutionality of G.L. 1956 § 22–1–2, the Senate redistricting statute, to decide whether the enactment violates the Compactness Clause of the Rhode Island Constitution.[1] The facts of this case are largely undisputed and concern events that are unique and unprecedented in Rhode Island history. In November 1994, a majority of the electorate voting in a statewide election adopted amendments to articles 7 and 8 of the Rhode Island Constitution that, commencing in January 2003, eliminated approximately one-quarter of the seats in the General Assembly.[2] This constitutional change, implemented for the 2002 general election and colloquially referred to as "downsizing," converted the 2002 decennial reapportionment of the Legislature—that typically would address changes in population—to a transformation of the General Assembly. Ordinarily, a decennial reapportionment is based on population shifts and involves a careful balancing of competing interests and adherence to federal and state constitutional principles of fair repre-

sentation. *See Miller v. Johnson,* 515 U.S. 900, 915, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) ("Electoral districting is a most difficult subject for legislatures, and so the States must have discretion to exercise the political judgment necessary to balance competing interests."). However, the 2002 redistricting coupled with a reduced number of districts made this constitutionally mandated task even more complicated and problematic.

To accomplish this undertaking, the General Assembly established a Special Commission on Reapportionment (commission), which consisted of sixteen members—five members of the House of Representatives, five members of the Senate, and six public members. *See* P.L.2001, ch. 315, § 1(a). The commission conducted public hearings throughout the state and ultimately recommended Senate and House district reapportionment plans. After additional public hearings and minor technical adjustments, these reapportionment plans were enacted by the General Assembly. *See* § 22–1–2 and G.L.1956 § 22–2–2. This appeal concerns a challenge to the constitutionality of four Senate districts in the East Bay.[3]

On August 22, 2002, the plaintiffs,[4] residents and registered voters of Barrington,

1. The original defendants in the action were William Irons, in his official capacity as president of the Rhode Island Senate, Edward S. Inman III, in his official capacity as Rhode Island secretary of state, and the Rhode Island State Board of Elections. After trial and while this appeal was pending, Joseph A. Montalbano succeeded William Irons as president of the Rhode Island Senate and Matthew A. Brown succeeded Edward S. Inman III as Rhode Island secretary of state. Accordingly, these elected officials have been substituted in this lawsuit in their official capacity pursuant to Rule 25(d) of the Superior Court Rules of Civil Procedure. In addition, the Towns of Barrington, Portsmouth, and Warren were allowed to intervene as defendants.

2. The membership in the General Assembly was reduced from fifty to thirty-eight senators and from one hundred to seventy-five representatives.

3. Although five of the new Senate districts lie within the "East Bay" of Rhode Island, encompassing the eight municipalities of Barrington, Warren, Bristol, Portsmouth, Little Compton, Middletown, Jamestown, and a portion of Newport, only four districts are the subject of this appeal.

4. The plaintiffs in the original complaint were: Joseph F. Parella, Muriel Kane, Reverend James C. Miller, Kathleen D. Bazinet, Raymond Cordeiro, Richard Ruggiero, Dr. Robert C. Arruda, David E. Barboza, David

Warren, Bristol, Tiverton, and Little Compton, the communities comprising Senate Districts 9,[5] 10, 11, and 12, filed suit in Superior Court challenging the redistricting statute. Because the relief plaintiffs sought also affected Senate District 13, an order issued on August 23, 2002, requiring that all candidates for Senate Districts 9, 10, 11, 12, and 13 be named as additional defendants. The plaintiffs filed an amended complaint adding Mary Ann Edwards, Charles S. Levesque, J. Clement Cicilline, and Teresa Paiva–Weed as defendants.

In their suit, plaintiffs contended that the districts failed to meet the constitutional mandate that they be as compact or contiguous in territory as possible. The plaintiffs argued that the disputed Senate districts did not follow natural, historic, geographic, or political lines.

On May 5, 2003, the case was tried before a justice of the Superior Court sitting without a jury. After several days of testimony, the trial justice rendered a thorough, well-reasoned, comprehensive forty-eight page decision. She reviewed the testimony of the witnesses and recognized that plaintiffs bore the burden of proving, beyond a reasonable doubt, that the redistricting statute violated the federal and state constitutions. The trial justice discussed the history of the redistricting statute and exhaustively reviewed both federal and state decisional law concerning reapportionment. Based on these findings of fact, settled jurisprudence, and the standard of review in such matters, the trial justice concluded that "[t]he [C]ompactness [C]lause is violated only when a reapportionment plan creates districts solely for political considerations, without reference to other policies, in such a manner that the plan demonstrates a complete abandonment of any attempt to draw equal, compact and contiguous districts."[6] The trial justice found that the Senate redistricting statute did not violate the Compactness Clause requirement nor was it a complete abandonment of the requirement of equally compact and contiguous districts. She held that the plan did not violate the United States or Rhode Island Constitution.

Three of the plaintiffs, Joseph F. Parella, William Enos, and Gary Mataronas (collectively, plaintiffs),[7] are before the Supreme Court on appeal from the judgment entered in favor of the defendants.[8] The plaintiffs argue that the trial justice erred by allocating to them the burden to

Esty, Halsey C. Herreshoff, Donald Bollin, Manuel R. Cabral, Paul E. Carroll, John H. Fernandes, Claudette J. Linhares, James Towers, Leonard C. Wright, William Enos, Richard D. Hart, Kenneth J. Fagundes, Jane P. Cabot, Ronald Coffey, and Gary Mataronas.

5. General Laws 1956 § 22–1–2 has since been amended so that District 9, encompassing all of the Town of Barrington and a portion of the Town of Bristol, is now District 32. *See* P.L.2005 ch. 367, § 1.

6. Article 8, section 1, of the Rhode Island Constitution provides: "The senate shall be constituted on the basis of population and the senatorial districts shall be as nearly equal in population and as *compact in territory as possible.*" (Emphasis added.)

7. Article I, Rule 5(a) of the Supreme Court Rules of Appellate Procedure requires that although two or more parties may file a joint notice of appeal pursuant to Article I, Rule 3(b) of the Supreme Court Rules of Appellate Procedure, each party is required to pay the prescribed filing fee. This Court has held that "[f]ailure of a party to tender the requisite fee renders its appeal invalid." *Kirby v. Planning Board of Review of Middletown*, 634 A.2d 285, 288 (R.I.1993). Because only these three plaintiffs paid a filing fee, the other plaintiffs in the original complaint are not properly before the Supreme Court.

8. Mary Ann Edwards, one of the defendants, was dismissed from the case by stipulation. The Town of Portsmouth was allowed to withdraw its participation from this appeal.

prove, beyond a reasonable doubt, that the configuration of the disputed Senate districts lacked a sufficient rationale. The plaintiffs also argue that the trial justice erred by disregarding "territorial restraints" in determining whether the compactness requirement was met and by not giving sufficient weight to the fact that the Senate districts were not "as compact in territory as possible." The plaintiffs' final claim of error is that the trial court erred by overlooking evidence of gerrymandering[9] in favor of incumbent senators. For the reasons stated herein, we concur with the well-reasoned analysis that the trial justice set forth. Because we agree with the decision and cannot improve upon it in any meaningful way, we adopt the trial justice's decision as our own, supplementing it with the following resolution of issues that were raised on appeal through counsels' provocative arguments to this Court.[10]

### Standard of Review

■ In *Holmes v. Farmer*, 475 A.2d 976 (R.I.1984), this Court declared that legislative judgments in the redistricting area are entitled to deference and that our review of the compactness requirement is limited. *Id.* at 986. We declared that "[t]he framers of the Constitution 'clearly intended to leave the [L]egislature with a wide discretion as to the territorial structuring of the electoral districts.'" *Id.* In addition, the United States Supreme Court repeatedly has held that "redistricting and reapportioning legislative bodies is a legislative task which the * * * courts should make every effort not to pre-empt." *McDaniel*

*v. Sanchez*, 452 U.S. 130, 150 n. 30, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981) (quoting *Wise v. Lipscomb*, 437 U.S. 535, 539, 98 S.Ct. 2493, 57 L.Ed.2d 411 (1978)). Consequently, this Court's review of legislative judgments in a redistricting case is limited to ensuring that the General Assembly "did not act 'without a rational or legitimate basis.'" *Holmes*, 475 A.2d at 986 (quoting *Opinion to the Governor*, 101 R.I. 203, 211, 221 A.2d 799, 803 (1966)).

■ In *Holmes*, we also held that the Compactness Clause of the Rhode Island Constitution "requires the districts to be as territorially compact '*as possible.*'" *Id.* This requirement dictates that the Compactness Clause is violated "'only when a reapportionment plan creates districts solely for political considerations, without reference to other policies, in such a manner that the plan demonstrates a complete abandonment of any attempt to draw equal, compact and contiguous districts.'" *Id.* Thus, we conclude that the trial justice was correct in her reluctance to invade the jurisdiction and judgment of a coequal branch of government in the redistricting domain, especially when the General Assembly has provided a sufficient rationale to justify its decisions.

### Burden of Proof

■ The plaintiffs argue that the trial justice erroneously assigned to them the burden of proving beyond a reasonable doubt that the challenged Senate districts lacked "sufficient rationale." However, every statute enacted by the Legislature is presumed constitutional and will not be

---

9. "Gerrymandering" refers to "[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength." Black's Law Dictionary 708 (8th ed.2004). The term was coined in 1812, when Massachusetts Governor Elbridge Gerry endorsed a district that resembled the shape of a salamander, to benefit members of his political party, the Anti–Federalists.

10. The parties in this case were well served by competent counsel, who submitted well-written briefs and presented reasoned argument to this Court.

invalidated by this Court unless the party challenging the statute proves *beyond a reasonable doubt* that the legislative enactment is unconstitutional. *State v. Russell,* 890 A.2d 453, 458 (R.I.2006). Because redistricting is a legislative function, we decline to reallocate the burden of proof to the General Assembly. To do so would directly undermine the narrow standard of judicial review we accord to all acts of the Legislature. Accordingly, the trial justice was correct in allocating this time-honored burden of proof—beyond a reasonable doubt—to the plaintiffs, who were challenging the constitutionality of the Senate redistricting plan.

For these reasons and those set forth in the annexed decision of the Superior Court,[11] the judgment is affirmed and the papers in this case are remanded to the Superior Court.

Justice SUTTELL did not participate.

---

## APPENDIX A

### STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, SC

SUPERIOR COURT

JOSEPH F. PARELLA, MURIEL KANE, REV. JAMES C. MILLER, KATHLEEN D. BAZINET, RAYMOND CORDEIRO, RICHARD RUGGIERO, DR. ROBERT C. ARRUDA, DAVID E. BARBOZA, DAVID ESTY, HALSEY C. HERRESHOFF, DONALD BOLLIN, MANUEL R. CABRAL, PAUL E. CARROLL, JOHN H. FERNANDES, CLAUDETTE J. LINHARES, JAMES TOWERS, LEONARD C. WRIGHT, WILLIAM ENOS, RICHARD D. HART, KENNETH J. FAGUNDES, JANE P. CABOT, RONALD COFFEY and GARY MATARONAS

VS.

WILLIAM IRONS, in his official capacity as Majority Leader of the Rhode Island Senate; EDWARD S. INMAN, III, in his official capacity as Rhode Island Secretary of State; RHODE ISLAND STATE BOARD OF ELECTIONS, MARY ANN EDWARDS, CHARLES S. LEVESQUE, J. CLEMENT CICILLINE, and TERESA PAIVA–WEED

Filed October 8, 2003

C.A. NO. 02–4578

### DECISION

### INTRODUCTION

McGUIRL, J.

"No right is more precious in a free country than that of having a voice in the

---

11. For brevity purposes, we have not included the attachments to the Superior Court decision.

election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481, 492 (1964). The right to vote is one of the most important rights we have as American citizens. The election of an individual to represent his or her fellow citizens in a legislative body is fundamental to our system of government. It is therefore impossible to overestimate the importance of an election law case.

We people in the State of Rhode Island take pride in our smallness, our family histories—our notion that we know everyone else that lives in our city or town or even in our State. We may have concerns about our elected officials, but we feel comfortable and trust our own local representatives because we know that person. They live down the street from us or coach our child's soccer team. We see them at the store, wakes, and parades. Thus any change in how we vote for those representatives, either in the way we vote or how many of us vote for a potential state senator, is important to all of us because we rely on the General Assembly to represent us effectively.

A momentous change in the nature of that representation took place nine years ago, in November of 1994, when the people of the State voted to reduce the membership in both bodies of the General Assembly as of January 2003. As a result of the constitutional mandate to reduce the number of senators from 50 to 38, the number of senators in the East Bay was reduced from seven to five. That constitutional mandate necessitated a review of the relationship of each part of the East Bay to the other and the relationship each East Bay Senator had with those citizens in their larger, reconfigured district.

The Rhode Island General Assembly adopted the Rhode Island Senate Redistricting Statute (G.L.1956 § 22–1–2) on February 20, 2002. In August 2002, plaintiffs filed their first amended complaint seeking a declaratory judgment that this redistricting statute is unconstitutional, specifically alleging violation of the compactness requirement found in article VIII, section 1 of the Rhode Island Constitution.

Plaintiffs limited the scope of their claim to the area within the towns of Barrington, Bristol, Jamestown, Little Compton, Middletown, Newport, Portsmouth, Tiverton, and Warren, which make up Senate Districts 9, 10, 11, 12 and, with respect to relief, District 13.

## PROCEDURAL HISTORY

The plaintiffs, on August 22, 2002, filed their first amended complaint in the instant action challenging G.L.1956 § 22–1–2, the so-called "redistricting statute" (alternatively, the Senate Plan). The plaintiffs in this case are various residents, and registered voters, of Barrington, Warren, Bristol, Tiverton and Little Compton. Those towns all fall within Districts 9, 10, 11 and 12. Although the towns of Portsmouth and Middletown and the city of Newport also fall within the four above-mentioned districts, the residents in those municipalities are not challenging the constitutionality of G.L.1956 § 22–1–2.[12] Plaintiffs allege that the Senate Plan is unconstitutional in that said districts are not "contiguous" and that the districts are not "as compact in territory as possible."

The defendants in this action are William V. Irons, in his official capacity as President of the Rhode Island Senate; William J. Murphy, in his official capacity

---

**12.** With respect to relief, District 13 would be affected as well.

as Speaker of the Rhode Island House of Representatives; and Matthew A. Brown, in his official capacity as Secretary of the State of Rhode Island. The Towns of Warren, Barrington and Portsmouth were granted intervenor status and support the current plan.

Defendants have argued that "contiguity" is not a mandate found within the Rhode Island Constitution and that contiguity and compactness are different concepts. Further, deviations from contiguity are "potentially relevant only in the context of a political gerrymander," which defendants assert is not applicable in this case. Finally, as to contiguity, defendants argue that the districts are, in fact, contiguous either by land, bridge, or via bodies of water.

The matter went to trial before this Court sitting without a jury in May of 2003. Final arguments were heard in June of that year.

### TRIAL TESTIMONY

#### A. Plaintiffs' Evidence

At trial, plaintiffs engaged a geographer, Chester Smolski, a Professor at Rhode Island College, to render an opinion on the compactness of the senatorial districts in the East Bay region as enacted by the General Assembly. The professor drafted three alternative plans that he believed were better than the challenged plan because his plans were "more compact." He argued that since he was able to draft three alternative plans, the challenged plan, by definition, was not drawn as compactly as possible. Professor Smolski reviewed the challenged plan, population data, community boundary lines, relevant literature and communities of interest. No statistical measure of compactness was performed.

In the East Bay, the Smolski Plans contain seven municipalities entirely within a district and five parts of other communities in the districts totaling twelve subdivisions. In Smolski Alternatives 3 and 4, incumbent Democratic Senator Theresa Paiva–Weed is paired with incumbent Republican Senator June Gibbs. In Alternative 5, incumbent Democratic Senator J. Clement Cicilline is paired with incumbent Republican Senator June Gibbs, and in all alternatives, incumbent democratic Senator Walter Felag is paired with incumbent Republican Senator David Bates. In his alternatives, he combined all of Barrington and Warren, and used a bridge to establish contiguity, in District 9. In District 10, Smolski combined the Town of Bristol with the northwest portion of Portsmouth, and its islands, and relied on bridges and a port for contiguity. In the Professor's alternative for District 11, he combined the towns of Tiverton and Little Compton with eastern Portsmouth and used a bridge for contiguity. In District 12, three municipalities were used (the redistricting statute has four municipalities in District 12) including all of Middletown.

At trial, Smolski testified that Districts 9 and 12 are not as compact as possible and that District 10 is not contiguous and not as compact as possible. In his opinion, contiguity, population, travel routes, municipal boundary lines, neighborhoods, local communities and geography were all relevant considerations in making those assessments.

Professor Smolski conceded on cross-examination that it would be impossible to draw five senate districts in the area of the East Bay without specifically dividing either the Town of Portsmouth or the Town of Bristol into three districts. In spite of this opinion rendered, two of his alternative plans do not divide Bristol or Portsmouth into three districts. He testified

that the Senate Plan was "not irrational, but not as good as" the plan he had drawn. He further testified that a plan could, in fact, be rational despite the absence of land-based contiguity, though it would "not [be] the best arrangement." Finally, he indicated that reasonable minds could differ as to the drawing of the senate districts.

Plaintiffs also retained the services of Victor Profughi, also a Professor at Rhode Island College, as an expert in this matter. Professor Profughi is a political scientist with particular expertise in studying Rhode Island government and politics. Professor Profughi reviewed socioeconomic data, with multiple variables, in determining whether the challenged statute maintained, or kept intact, various communities of interest for purposes of redistricting. He also reviewed relevant literature and historical data. His definition of compactness, for purposes of his analysis, was districts that are "together," "symmetrical and orderly." [13] He also related the concept of effective representation to the concept of compactness. His position was that the more compact a district, the greater the likelihood of similarities between the people. The more similarities would indicate more effective representation.

Communities of interest, as defined by Professor Profughi, "reflect commonalities" between individuals. Using information compiled from census data, Professor Profughi looked at socioeconomic indicators of the portions of the municipalities in the East Bay districts to determine if there were communities of interest. The variables reviewed included: owner-occupied housing; minor children in household; households with adults over the age of sixty-five; whether or not one is a native Rhode Islander; whether or not one is a foreign-born individual; amount of bachelor and graduate degrees; median income; and percentage below poverty lines. In his opinion, those variables are sufficient to make an effective determination of communities of interest; although, he conceded that many of the differences were not necessarily significant differences. Due to data drawn from census tracks, Professor Profughi's analysis actually "double counted" some registered voters in Districts 10 and 12 in order to complete his work.

Based on his analysis, Professor Profughi found the districts, as drawn, irrational. Professor Profughi, however, also surmised that it would not be irrational for a reasonable mind to disagree with his data or the conclusions drawn from his data. On cross-examination, he agreed with defense counsel that the concept of "functional compactness" was a concept that would be rational for the General Assembly to consider in drawing up the new districts. Professor Profughi also testified that objective measurements, such as "dispersion, perimeter, and population measures," exist and may be used to prove relative compactness. Nonetheless, plaintiffs failed to present this Court with any evidence in this regard.

The plaintiffs also called three elected representatives: Senator June Gibbs; Senator Mary Parella; and Representative William Enos. Representative Enos is also a named plaintiff in this action. These members of the legislature all currently represent constituents in the East Bay area, with Senator Gibbs representing new Senate District 12, Senator Parella representing new Senate District 11, and Repre-

---

13. Professor Profughi conceded that if the definition of compactness used was incorrect, then that would lead to incorrect conclusions for purposes of this analysis.

sentative Enos representing new House District 71.

Representative Enos was the senator for former Senate District 47 from 1987 through 2002. That district was primarily made up of the Towns of Tiverton and Little Compton, with a smaller portion of Warren comprising the rest of the district. During the statewide 2002 elections, then-Senator Enos made a decision to run for the newly created house seat. He spoke of the lifelong ties he has with the community and the similarities that many of the communities in that district shared. He described the difference between Tiverton and Little Compton, as well as Middletown and Newport. Representative Enos also discussed the distance from one end of the Senatorial district to the other end and other geographical obstacles between parts of the district. Although he considered running for the seat in Senate District 12, he believed that running in a district where a majority of the citizens hailed from areas that he had never represented, Newport and Middletown, would be a "fool's race." In addition to that pragmatic assessment, Representative Enos also testified that he would be doing the citizens of those towns a disservice because he believed: "I have no business representing Middletown and Newport. I don't know Middletown and Newport." Thus he chose to represent the people he felt that he would be best able to serve, those in Tiverton and Little Compton, or, in his words, "God's country," and to continue to have a voice for those people in state government.

It was also his testimony that Senate District 47, the former district that he represented; House District 71, the current district that he represents; and current Senate District 12, the district in which he would have been eligible to run, were all unconstitutional. Representative

Enos also testified that he was effectively representing the constituents of his current district and, as a whole, effectively represented the constituents of his former district. However, he stated that he would not be able to represent the voters of current Senate District 12, who resided in Middletown and Newport as effectively as he would those voters in the portion of Senate District 12 who resided in Tiverton and Little Compton.

Senator Parella was the senator in former District 45 and a lifelong resident of Bristol. Prior to redistricting, her district breakdown was approximately three-quarters Bristol and one-quarter Warren. The current senate district that Senator Parella represents, District 11, on the other hand, is approximately two-thirds Portsmouth and only one-third Bristol. It was her testimony, as a resident and elected representative, that the division of Bristol into three districts dilutes the representation for the population of Bristol. She testified that the three portions of Bristol, each of which is a minority in Districts 9, 10 and 11, "are linked with communities that they have very little in common with," most notably, those portions of Bristol within Districts 9 and 10. The division, in her opinion, unnecessarily divided neighborhoods, put the municipalities together in such a way that issues of local and statewide concern might often clash, and ignored other natural and geographic boundaries. Senator Parella was particularly concerned with the Town of Bristol having a resident senator from the town and the inherent improbability for that occurrence if the Town of Bristol is divided into three minority enclaves. Though acknowledging the challenge of representing the people of Portsmouth as a resident of Bristol, Senator Parella was confident in her ability and desire to effectively represent her constituents in District 11.

Senator June Gibbs, the representative for Senate District 12, also testified. The Senator has lived in Middletown for over fifty years and has represented the area since 1984. Senator Gibbs recognized the difficulties in representing a senatorial district that was geographically larger than her previous district, including increased travel time. Representing more voters within a district was, and is, also a challenge. One of those challenges included meeting a new group of constituents and recognizing the needs of that constituency. She conceded that some of the issues important to the citizens of Tiverton and Little Compton located in District 12 are also important to citizens of Middletown and Newport in District 12. But she testified that some of the issues, including but not limited to education, tourism, and employment in the defense field, impact the towns within District 12 to a much different degree. Despite the challenges perceived by Senator Gibbs, it is her belief that she is effectively representing the needs of all of the citizens of District 12.

## B. Defendants' Evidence

Professor William Rives, a demographer, statistician and professor at Ohio State University's Fisher Colleges of Business, testified as an expert. He examined Bristol and Portsmouth with regard to the social and economic makeup of the two towns to determine which of the two exhibited greater socioeconomic heterogeneity. Professor Rives used a wide range of demographic, economic and social characteristics found in the 2000 Census data to conduct his analysis, and, in reaching his conclusions, he used two statistical methods, the "Index of Dissimilarity" and the "Variance Analysis." He testified that Bristol's average Index of Dissimilarity is 19.5, while Portsmouth's is 13.2, thereby reflecting that Bristol is more socioeconomically heterogeneous than Portsmouth using the Index of Dissimilarity. He found that Bristol is also more socioeconomically heterogeneous than Portsmouth, using the Variance Analysis.

Professor Rives testified that the decision to divide the Town of Bristol into three senatorial districts instead of the Town of Portsmouth was based upon rational concepts. In his opinion, the demographic differences and socioeconomic differences between the residents of Bristol, when compared with the same data in Portsmouth, supported the General Assembly's rational decision to create three senatorial districts in Bristol instead of Portsmouth.

The final expert to testify was Kenneth Payne, an expert in planning and a senior policy advisor to the Rhode Island Senate. He rendered an opinion regarding the rationality of placing the different municipalities in the new senate districts. Specifically, he testified about the communities of interest within the East Bay senate districts. Mr. Payne was of the opinion that the East Bay's historic, cultural, economic and geographic identity supported the communities of interest in the five East Bay districts. He testified that the adopted plan channeled the natural and predominantly marine features of the districts together and kept the municipalities of Aquidneck Island intact.

He testified specifically that District 9, which comprises Barrington and western Bristol, contains the portion of the East Bay region oriented toward the upper part of the Narragansett Bay, Providence suburban areas and the Route 114 corridor, as well as containing estate areas. In District 10, made up of Warren, eastern Bristol, and northern Tiverton, Mr. Payne also found communities of interest. Those included sharing the Kikemuit River and Mount Hope Bay, as well as containing manufacturing areas in Warren and Tiver-

ton with historic links to Fall River. Mr. Payne also identified communities of interest within District 12, such as sharing two shores of the Sakonnet River, containing the water supply resources of the Newport water system, and holding many of the region's significant barrier beaches; defense industry concerns; the fact that Little Compton has stopped sending its high school students to high school in Middletown, with the option for current high school students already attending; as well as the notion that the towns were former agricultural summer colonies that formed into suburban development towns.

Mr. Payne in his testimony conceded that the plan was rational in terms of transportation corridors, historical development patterns, as well as the historical relationships existing among the communities that compose Districts 9, 10, 11, 12 and 13 most specifically. He testified that the division of Bristol into three senate districts was in harmony with historical settlement and economic patterns and also the natural geographic features of the area. For example, District 11 contains the town center of Bristol, the harbor and important bridge connections with the town of Portsmouth. District 9 contains the "upper bay" and is characterized by its suburban attributes. District 10 contains the Kickemuit River, which is a long running source of local focus and concern. On cross-examination, it was determined that again no quantitative analysis was performed in making community of interest determinations. Other communities of interest identified by Mr. Payne, such as shared interests in manufacturing, agriculture, marine resources and transportation corridors, were conceded to be issues shared by many municipalities in Rhode Island.

## LEGAL ANALYSIS

### A. Standard of Review

■■ Rule 52 of the Rhode Island Superior Court Rules of Civil Procedure provides that "[i]n all actions tried upon the facts without a jury ... the court shall find the facts specially and state separately its conclusions of law thereon...." R.I. Sup. Ct. R. Civ. P. Rule 52(a) (2003). Pursuant to this authority, "[t]he trial justice sits as a trier of fact as well as of law." *Hood v. Hawkins*, 478 A.2d 181, 184 (R.I.1984). "Consequently, he [or she] weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences." *Id.* "The task of determining the credibility of witnesses is peculiarly the function of the trial justice when sitting without a jury." *Id.* "It is also the province of the trial justice to draw inferences from the testimony of witnesses...." *Walton v. Baird*, 433 A.2d 963, 964 (R.I.1981); *see also Rodriques v. Santos*, 466 A.2d 306, 312 (R.I.1983) (the question of who is to be believed is one for the trier of fact).

■ When rendering a decision in a non-jury trial, a trial justice "need not engage in extensive analysis and discussion of all the evidence. Even brief findings and conclusions are sufficient if they address and resolve the controlling and essential factual issues in the case.'" *Donnelly v. Cowsill*, 716 A.2d 742, 747 (R.I.1998) (citing *Anderson v. Town of East Greenwich*, 460 A.2d 420, 423 (R.I. 1983)). "We have never demanded that a trial justice make findings with respect to every witness or issue in which 'a full understanding of the issues' and the conclusions of the fact finder 'may be reached without the aid of separate findings.'" *Id.* (citing *Anderson*, 460 A.2d at 423–24).

## B. Burden of Proof

 Our Rhode Island Supreme Court has consistently held that "all laws regularly enacted by the legislature are presumed to be constitutional and valid." *City of Pawtucket v. Sundlun,* 662 A.2d 40, 45 (R.I.1995). Rhode Island courts will " 'make every reasonable intendment in favor of the constitutionality of a legislative act, and so far as any presumption exists it is in favor of so holding.' " *Id.* (quoting *State v. Garnetto,* 75 R.I. 86, 63 A.2d 777, 781 (1949)). A party attempting to invalidate a legislative act has a heavy burden to carry. *Id.* The Court will not annul a legislative enactment unless the challenging party can prove "beyond a reasonable doubt" that the statute in controversy is repugnant to a constitutional provision. *Id.* (citing *Gorham v. Robinson,* 57 R.I. 1, 186 A. 832, 837 (1936)). In addition to the heavy burden of establishing beyond a reasonable doubt that a statute is repugnant to our constitution, a party challenging the constitutionality of a statute must also show that our General Assembly, in enacting the statute, did so without a rational or legitimate basis. *Holmes v. Farmer,* 475 A.2d 976, 978 (R.I.1984).

## C. Redistricting law

### 1. Statute

Article VIII, section 1 of the Rhode Island Constitution is at the center of the constitutional challenge in this case.[14] In addition to the aforementioned downsizing requirement, it reads: "The senate shall be constituted on the basis of population and the senatorial districts shall be as nearly equal in population and as compact in territory as possible." Plaintiffs claim

that G.L.1956 § 22–1–2, the redistricting statute that actually delineates the actual boundaries of the different districts, violates this constitutional provision.[15]

Rhode Island Public Laws chapter 315, enacted in 2001, provided the General Assembly with the enabling legislation to accomplish its goal of downsizing and redistricting based on the 2000 United States Census. That law established a "special commission on reapportionment" comprised of members of both houses of the General Assembly, as well as members of the general public. *See* 2001 R.I. Pub. Laws 315 § 1(a). The stated purpose of the Commission was to "draft and to report to the general assembly an act to reapportion the districts of the general assembly and the state's United States congressional districts and to perform the necessary functions incident to drafting such an act including, but not limited to, the division of the state into seventy-five (75) state representative districts, thirty-eight (38) state senatorial districts and two (2) United States congressional districts as near equal as possible." Ch. 315 § 1(b).

Following the creation and the purpose of the law, the General Assembly created governing standards for reapportionment within chapter 315. In addition to the required minimal population deviations for the federal and state districts within Rhode Island, *see* Ch. 315 § 2(c)(i)-(ii), the law also contains language that forms the core of this debate. "Congressional and state legislative districts shall be as compact in territory as possible and, to the extent practicable, shall reflect natural, historical, geographical and municipal and other political lines, as well as the right of

---

14. Though at various times our constitution has been renumbered and amended, the "compact in territory" language has remained unchanged.

15. Rhode Island General Laws 1956 section 22–1–2 is attached, in full, as annotated attachment # 1.

all Rhode Islanders to fair representation and equal access to the political process." Ch. 315 § 2(d). Additional language provides that "[t]o the extent practicable, congressional and state legislative districts shall be composed of contiguous territory." Ch. 315 § 2(e). Finally, but not unimportantly, the "act shall be construed in all respects so as to meet any constitutional requirements in carrying out the purposes and provisions of this act, all steps shall be taken which are necessary to meet constitutional requirements." Ch. 315 § 5.

## 2. *Relevant Federal Law*

Though this case is being challenged based upon perceived violations of the Rhode Island Constitution, reference to federal law is useful in order to glean a proper understanding of the state of this difficult field of law. In *Reynolds v. Sims,* the United States Supreme Court reviewed the constitutionality of a reapportionment plan in terms of population variances between state electoral districts and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[16] 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Pertinent to the case at bar, the Court opined:

"A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. Valid considerations may underlie such aims. Indiscriminate districting, without any regard for political subdivision or natural or historical boundary lines, may be little more than an open invitation to partisan gerrymandering." 377 U.S. at 578–79, 84 S.Ct. 1362.

In addition to discussing indiscriminate districting within a state, the Court also noted the remedial techniques available to a court confronted with an unconstitutional legislative district. "[O]nce a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Id.* at 585, 84 S.Ct. 1362. While the timing of relief for an unconstitutional plan is an important consideration for a court in crafting a remedy, " 'any relief accorded can be fashioned in the light of well-known principles of equity.' " *Id.* (quoting *Baker v. Carr,* 369 U.S. 186, 250, 82 S.Ct. 691, 727, 7 L.Ed.2d 663, 705 (1962) (Douglas, J., concurring)).

The United States Supreme Court has had occasion to review other constitutional challenges to redistricting statutes. In *Karcher v. Daggett,* the Court found New Jersey's reapportionment plan unconstitutional because of unexplained population deviations between districts. 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983). The Court discussed a two-part burden shifting approach for population deviation cases. "The first consideration for a court to consider is whether the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population[,]" and that burden belongs to the challenging party. 462 U.S. at 730–31, 103 S.Ct. 2653. Second, "[i]f, however, the plaintiffs can establish that the population differences were not the result of a good-faith effort to achieve equality, the State must bear the burden of proving that each significant variance between districts was necessary to achieve some legitimate goal."

---

**16.** In the case at bar, it is conceded that population concerns are not an independent

basis for finding the challenged districts unconstitutional. *See Pl.'s Pretrial Mem. at 12.*

*Id.* at 731, 103 S.Ct. 2653 (citations omitted). In *Karcher,* the plan was unconstitutional because the defendants could not meet their burden.

Since that time, the United States Supreme Court has discussed other elements deemed as traditional districting principles. *See, e.g., Shaw v. Reno,* 509 U.S. 630, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (discussing compactness, contiguity and respect for political subdivisions as such principles); *Miller v. Johnson,* 515 U.S. 900, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995) (considering communities with actual shared interests as principle of districting); *Bush v. Vera,* 517 U.S. 952, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (maintaining communities of interest and traditional boundary lines as traditional districting principles); *Abrams v. Johnson,* 521 U.S. 74, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997) (mentioning traditional district cores and protecting incumbents from facing each other in reelection campaigns as districting principles).

Issues of compactness, contiguity, communities of interest, political gerrymandering, and effective representation are issues that have confronted both federal and state courts in an increasing fashion since the well-founded "one person, one vote" concept was established by the United States Supreme Court in *Sims.* Of course, the definitive resolution of this matter requires an examination of the analyses set forth by courts of this jurisdiction and the application of that law to the unique set of facts and circumstances presented in this trial.

### 3. *Rhode Island Law*

The seminal opinion in Rhode Island from our Supreme Court on the issue of redistricting is *Opinion to the Governor,* 101 R.I. 203, 221 A.2d 799 (1966). There, the Court was presented with questions concerning the constitutionality of the redistricting legislation in light of the amendments to the Rhode Island Constitution requiring that electoral districts be as "compact in territory as possible." Initially, the Court noted "that the framers of the constitution, in providing that such districts be territorially compact, intended that it apply to any districts the legislature might from time to time have authority to establish. To hold to the contrary would be to deny vitality to the constitution." *Id.* at 801. Further, the amendments to the constitution "confer[ ] no power on the legislature to establish electoral districts but is a limitation on the power to so act already possessed by the Legislature." Thus the Court recognized the inherent power of the legislature to create electoral districts:

"[S]tate legislatures possess plenary power in the legislative area except as the same may be limited by the Constitution of the United States or the constitution of this state. In other words, the legislature of this state would have plenary power to provide for election machinery, including the establishment of electoral districts, but for the restrictions thereon set out [the Rhode Island Constitution]. In short, we are concerned here with a determination of the extent to which the broad power of the legislature to structure electoral districts is circumscribed by that provision of [then] arts. XIII and XIX requiring that each such district territorially be 'as compact in territory as possible.'" *Id.*

"The framers of the constitution, in requiring territorial compactness, clearly intended to leave the legislature with a wide discretion as to the territorial structuring of the electoral districts." *Id.* at 803. The Court opined that this is so based on the language of the amendment requiring the districts to be as compact "as possible."

"The phrasing of the constitutional limitation discloses a recognition of the legislative character of the determinations that must be made to establish the factors that govern the structuring of electoral districts so as to insure voting equality therein." *Id.*

The Court noted the imprecise meaning of the term "compact" when referring to the constitutional mandate. "While a division into tightly packed districts with regular lines might literally satisfy the constitutional requirement, our state with its irregular boundaries, its bays and its inlets, its islands, its rivers and lakes and its many other geographical features is obviously not susceptible to being divided into circular planes or squares." *Opinion to the Governor*, 221 A.2d at 802.

 The Court went on to further discuss "compactness:"

"The term 'compact' then, as it is used in the constitution, has reference to a principle, rather than to a definition, and has meaning only within an appropriate factual context. Its origins as a constitutional requirement lie in an intention to provide an electorate with effective representation rather than with a design to establish an orderly and symmetrical geometric pattern of electoral districts. Undoubtedly a principal inducing factor for its adoption was the desire to avoid the political gerrymander. There was then, as there is now, a recognition that the structuring of electoral districts containing equal numbers of people or voters, standing alone, would not necessarily insure effective participation in representative government." *Id.*

The Court recognized the necessity for effective representation as the ultimate goal in establishing, maintaining and creating legislative districts and reemphasized that a "principal" purpose of compactness

was to prevent political gerrymandering. Limitations on a legislature's power, so as to avoid a political gerrymander, are "necessary to the preservation of true representative government...." *Id.* (internal quotations omitted).

 Though our own constitution makes no explicit reference to contiguity, unlike many other state constitutions, the Court considered that factor an important consideration in determining compactness in a case with political gerrymandering. "[A]ny deviation from contiguity and from natural, historical, geographical, and political lines for the purpose of achieving a political gerrymander is constitutionally prohibited by the mandate of compactness." *Id.* at 803. "This is not to say that departures from those criteria in order to accomplish a racial or an ethnic gerrymander or to insure as far as possible the reelection of an incumbent, or to make inconvenient or impractical an exercise of the franchise, are not also prohibited." *Id.* "[I]f the objective of compactness is to be attained," and a challenger shows redistricting based solely on political considerations, "the deviations must be explainable by rational and legitimate considerations; they must be in good faith; and they must be justifiable upon grounds which ... 'are free from any taint of arbitrariness or discrimination.'" *Opinion to the Governor*, 221 A.2d at 803 (citations omitted).

 Territorial compactness, then, is "peripheral in its thrust" and is a legislative function to determine whether a district is as compact as possible. "[W]hether there has been a complete departure from the requirement for compactness is a judicial question, but the determination of the territory that necessarily would have to be included in a district to provide that that district be as compact as possible is for legislative determination." *Id.*

The Court conducted a fact-finding analysis in *Holmes v. Farmer*, 475 A.2d 976 (R.I.1984). There, among other things, the Court was confronted with a political gerrymander challenge to the redistricting in the Rhode Island House of Representatives, with the plaintiffs alleging a violation of the constitutional compactness requirement. The plaintiffs' major assertion of the alleged violations of the compactness requirement focused on "an excessive number of crossings of municipal boundaries in the statewide plan and the alignment of district 98 in the town of Jamestown with a portion of the city of Newport rather than with the town of North Kingstown." *Id.* at 985.

The Court relied heavily upon *Opinion to the Governor* for the proposition that compactness, for purposes of our constitution, relates to effective representation, and not simple geographic formulae, particularly in light of the irregular shape of Rhode Island. *Id.* at 985–86. Indeed, a review of a compactness challenge is "limited." *Id.* at 986. The phrasing of the constitutional limitation suggests this result in that it requires the districts to be as territorially compact "as possible." *Id.* The Court's role is "to ensure that the Legislature did not act 'without a rational or legitimate basis.'" *Id.* (citations omitted). "The clause is violated ... 'only when a reapportionment plan creates districts solely for political considerations, without reference to other policies, in such a manner that the plan demonstrates a complete abandonment of any attempt to draw equal, compact and contiguous districts.'" *Holmes*, 475 A.2d at 986 (citations omitted).

The Court noted *Opinion to the Governor's* explanation that an electoral district violates the compactness requirement only when the legislature acts without a rational or legitimate basis. *Id.* Thus a court's

limited role is to ensure that the legislature acted in a rational or legitimate manner. *Id.* The Court reviewed the trial justice's analysis of the pros and cons of placing Jamestown with either North Kingstown or Newport, as well as the General Assembly's proffered reasons for making its decisions. The trial justice's conclusions "that neither tie was substantially stronger" necessarily left "the decision in the hands of the Legislature, which exercised its discretion in connecting Jamestown to a portion of Newport. The legislative decision to link Jamestown with Newport was based on legitimate factors and was clearly not irrational." *Id.* "Rhode Island's unique geographic features make compliance with the compactness requirement difficult at times[,]" nevertheless, the Court did not "wish to lessen the importance of this constitutional mandate...." *Id.* at 987. The Court upheld the redistricting legislation as enacted by the General Assembly, finding no constitutional violation of the compactness requirement.

However, a constitutional violation was found in *Licht v. Quattrocchi*, 449 A.2d 887 (R.I.1982). In *Licht*, the Court stated:

"The reapportionment plan enacted by the General Assembly, P.L.1982, ch. 20, violates the requirement of compactness contained in Article XIX of the amendments to the Constitution of Rhode Island pursuant to the findings of the trial justice that the redistricting of senatorial districts in the city of Providence unnecessarily and improperly crossed natural boundaries and violated the principle of contiguity for impermissible purposes." *Licht*, 449 A.2d at 887.

The trial court's earlier decision found, inter alia, that the plan in that case violated the Rhode Island Constitution because the plaintiffs had proven, beyond a reasonable doubt, that the districts had been

crafted to achieve a political gerrymander, and the challenged districts were either not compact, not contiguous, or both. *See Licht v. Quattrocchi*, 1982 R.I.Super. Lexis 61 (R.I. Super Ct.1982). Judge Bulman interpreted *Opinion to the Governor* for the proposition that "compactness is a constitutional principle designed to eradicate political gerrymandering in any form or guise." *Id.* at *13. "[D]eviations from natural, historical, geographical, and political lines must be explained by rational and legitimate considerations, in good faith, and free from any taint or arbitrariness or discrimination." *Id.* at *14 (citing *Opinion to the Governor*, 221 A.2d at 803). The Court found that the constitutional requirement for compactness was violated because the redistricting was done "without a rational or legitimate basis, was not enacted in good faith, and was not free from the taint of arbitrariness or discrimination." *Id.* at 14–15. There, the senate districts violated the constitutional mandate of compactness because of deviations from natural, historical geographical and political boundaries "for no rational or legitimate reason, but for the prohibited political purpose of protecting some incumbents while punishing others." *Id.* at *15. Compactness was further violated, according to the trial justice, because districts were connected "in a totally non-contiguous way" solely because of the political considerations of favoring some and punishing others. *Id.*

Another noteworthy case that reviewed a Rhode Island compactness challenge is *Farnum v. Burns*, 561 F.Supp. 83 (D.R.I. 1983). The Federal District Court of Rhode Island found violations based upon population requirements in an earlier decision, *Farnum v. Burns*, 548 F.Supp. 769 (D.R.I.1982), and the parties appeared before the court on the defendants' motion to determine if their interim redistricting plans could be used. *See Farnum*, 561 F.Supp. at 87. The compactness requirement is "intended 'to provide an electorate with effective representation' and prevent 'political gerrymander.'" *Id.* at 90 (quoting *Opinion to the Governor*, 221 A.2d at 802). The federal court enunciated a two-part test. "First, it must be determined whether district lines deviate from natural, historical, geographical and political lines." *Id.* at 91. If there is a deviation, "it must be justified by rational and legitimate considerations, made in good faith, and free from any taint of arbitrariness or discrimination." *Id.* (citing *Opinion to the Governor*, 221 A.2d at 803). However, "[t]he fact that the ... districts deviate from geographical, historical and political lines does not in itself mean that they are constitutionally prohibited by the mandate of compactness." *Id.* Political gerrymandering—drawing districts purely for political reasons—is the additional element required. *Farnum*, 561 F.Supp. at 91. There, the court found both a political gerrymander and a deviation from geographic boundaries. *Id.* Therefore, the constitutional mandate of compactness was violated. *Id.* at 92.

This Court notes that the Farnum decision is not binding and is merely instructive to the extent that it does not conflict with Rhode Island law. Subsequent to *Farnum*, the Rhode Island Supreme Court issued *Holmes*, initially questioning whether the federal court's decision was void for lack of subject matter jurisdiction. *Holmes*, 475 A.2d at 978 n. 2. To the extent that there is a conflict between the holdings of *Farnum* and *Holmes, Holmes* controls; to the extent that the parties' respective burdens are different in the two cases, the appropriate burden of proof is found in *Holmes*. 475 A.2d at 985–86, *supra*.

## FINDINGS OF FACT

### A. Parties' Agreed Finding of Facts

1. The Rhode Island Constitution requires that the membership of the Rhode Island Senate shall be reduced from 50 to 38 Senators (and from 100 to 75 Representatives in the House of Representatives) as of January 7, 2003 (see Rhode Island Constitution, art. VIII, § 1 (art. VII, § 1), as amended by a majority of the vote in the statewide election on November 8, 1994).

2. To implement the constitutionally required reduction in size of the Senate and House of Representatives, the General Assembly established a Reapportionment Commission. The Reapportionment Commission consisted of 16 members: three from the House of Representatives appointed by the Speaker; two from the House of Representatives appointed by the Minority Leader of the House of Representatives; three from the Senate appointed by the Majority Leader of the Senate; two from the Senate appointed by the Minority Leader of the Senate; three members of the general public appointed by the Speaker; and three members of the general public appointed by the Majority Leader of the Senate.

3. The total population in the State of Rhode Island at the time of the redistricting was 1,048,319. Therefore, the ideal Senate district population with 38 senators was 27,587.

4. As a result of the constitutional mandate to reduce the number of senators from 50 to 38, the number of senators in the East Bay region was reduced from seven to five.

5. The Reapportionment Commission held numerous public hearings at which it heard extensive public comment on proposed redistricting plans at hearings throughout the state.[17] The Commission retained consultants, including Kimball Brace of Electronic Data Services ("EDS") and H. Reed Witherby, Esq. of Smith & Duggan LLP to advise the Commission.

6. The Commission unanimously recommended that the General Assembly adopt proposed Senate Plan E as amended.

7. The General Assembly then held its own hearings and enacted new House and Senate plans based largely upon the Commission's recommendation. The plans became law on February 20, 2002. See G.L. 1956 §§ 21–1–1 and 21–1–2.

8. As a result of the downsizing, 26 Senate Districts included one incumbent and 12 Senate Districts paired two incumbents.[18]

9. After enactment of the Senate Redistricting Statute, Senator Mary Parella of Bristol was re-elected as a senator from new Senate District 11.[19]

---

17. "The dates and locations of the public hearings are as follows: August 9, 2001 (State House), August 28, 2001 (State House), September 13, 2001 (South Kingstown High School), September 18, 2001 (State House), September 20, 2001 (Warwick City Hall), September 24, 2001 (Barrington High School), September 25, 2001 (Newport City Hall), September 27, 2001 (Woonsocket City Hall), October 9, 2001 (State House), October 23, 2001 (State House), October 30, 2001 (State House), November 1, 2001 (State House), November 8, 2001 (State House), November 13, 2001 (South Kingstown High School), November 14, 2001 (Woonsocket City Hall), November 15, 2001 (Warwick City Hall), November 20, 2001 (State House), November 27, 2001 (Barrington High School), November 29, 2001 (Newport City Hall), December 4, 2001 (State House), December 7, 2001 (State House), December 11, 2001 (State House), January 25, 2002 (State House)."

18. A listing of the incumbent pairings is omitted from this decision.

19. Although plaintiffs agree to this fact, they note that Senator Parrella did not carry the majority of the voters in the Portsmouth section of Senate District 11.

10. After enactment of the Senate Redistricting Statute, Senator David Bates of Barrington was re-elected as a senator from new Senate District 9.

11. After enactment of the Senate Redistricting Statute, Senator Walter Felag of Warren was re-elected as a senator from new Senate District 10.

12. After enactment of the Senate Redistricting Statute, Senator June Gibbs of Middletown was re-elected as a senator from new Senate District 12.[20]

13. After enactment of the Senate Redistricting Statute, Senator M. Theresa Paiva–Weed of Newport was re-elected as a senator from new Senate District 13.[21]

14. Plaintiff, William Enos of Tiverton, a senator in former Senate District 47, chose not to run in the Senate election. Instead, he ran in the new House District 71 and was the successful candidate, beating his opponent, incumbent Joan Quick.

15. Article VIII, section 1 of the Constitution of the State of Rhode Island provides:

The senate shall consist of the lieutenant governor and fifty members from the senatorial districts in the state, provided, however, that commencing 2003 the senate shall consist of thirty-eight members from the senatorial districts in the state. The senate shall be constituted on the basis of population and the senatorial districts shall be as nearly as equal in population and as compact in territory as possible. The general assembly hall, after any new census taken by authority of the United States, reapportion the representation to conform to the Constitution of the State and the Constitution of the United States.

16. District 13 contains the City of Newport almost in its entirety and the Town of Jamestown, which has historic ties to Newport through ferry and bridge connections and social services including especially those pertaining to health and housing.

17. According to the 2000 U.S. Census, the population in District 9 is 64.1% Barrington and 35.9% Bristol; the population in District 10 is 14.9% Bristol, 42.9% Warren, and 42.2% Tiverton; the population in District 11 is 34.7% Bristol, 65.3% Portsmouth; and the population in District 12 is 12.7% Little Compton, 61.3% Middletown, 11.5% Newport and 14.4% Tiverton.

18. According to the 2000 U.S. Census, the population in Lincoln makes up 15.1% of District 7; the population of East Providence makes up 8% of District 8; the population in District 16 is 65.7% Central Falls, 23.1% Pawtucket, and 11.3% Cumberland; the population in North Smithfield makes up 5.8% of District 21; the population in North Smithfield makes up 8.8% of District 23; the population in Foster makes up 16.1% of District 24; the population of Warwick makes up 12.2% of District 28; the population of Warwick makes up 4.2% of District 35; and the population in District 33 is 81.8% Coventry, 9.6% East Greenwich, 6.1% West Warwick, and 2.5% Warwick.

19. The Senate Plan has 15 Districts wholly contained within one municipality; Districts wholly contained in two municipalities; six Districts include portions of three municipalities; two Districts include portions of four municipalities; and one District includes portions of five municipalities.

---

20. Although plaintiffs agree to this fact, they note that Senator Gibbs did not carry the majority of the voters in the Little Compton section of Senate District 12.

21. Plaintiffs agree with this fact, however, argue a lack of relevancy.

20. Bristol is a diverse community.

21. A census block is approximately 100 people on average.

22. A census block group is approximately 1,000 people on average.

23. A census tract is approximately 4,000 people on average.

24. U.S. Census Bureau Summary File 3 (SF-3) data started to become public in the Summer/Fall of 2002.

25. In the East Bay, the Senate Districts contain six municipalities entirely within a district and seven parts of other communities in the districts totaling 13 subdivisions.

26. In the East Bay, the Smolski plans contain seven municipalities entirely within a district and five parts of other communities in the districts totaling 12 subdivisions.

27. In Smolski alternatives 3 and 4, incumbent Democratic Senator Teresa Paiva-Weed is paired with incumbent Republican Senator June Gibbs.

28. In Smolski alternative 5, incumbent Senator J. Clement Cicilline is paired with incumbent Republican Senator June Gibbs.

29. In all Smolski alternatives, incumbent Democratic Senator Walter Felag is paired with incumbent Republican Senator David Bates.

30. For 26 years, from September 1976 through 2002, high school graduates in Little Compton were bussed to Middletown High School in Middletown for grade 9 through 12. Busses picked up Little Compton high school students at designated bus stops, drove through Tiverton, across the Sakonnet Bridge, through Portsmouth and into Middletown to the Middletown High School. This year Little Compton voted to send Little Compton students to Portsmouth High School. *See* Joint Statement of Undisputed Facts; *see also* Defendant's Post-Trial proposed find-

ings of fact and conclusions of law; Plaintiff's response to Defendant's proposed findings of fact.

## B. Additional Findings of Fact by the Court after Trial

1. Given the constitutional population equality requirements and the characteristics of the East Bay region, it is not possible to draw five senate districts in that area without dividing either Bristol or the Town of Portsmouth.

2. There is a rational and legitimate basis for dividing Bristol, as opposed to Portsmouth, into three districts.

3. As a result of the downsizing of the General Assembly, membership percentages rose for Republicans and women, and the number of racial minorities remained the same.

4. District 9 consists of all of the Town of Barrington and a portion of Bristol. Driving from Poppasquash to Rumstick Point requires crossing through District 10 and over the bridge, which is a distance of 8.8 miles and takes about 20 minutes. It contains the portions of the East Bay region that are oriented towards the upper Narragansett Bay; the areas of the Providence, Warren, and Bristol railroad, the subsequent trolley service and Route 114 corridor; and the estate areas of Nyatt Point and Rumstick Point in Barrington, and Poppasquash Point in Bristol. According to the 2000 U.S. Census, the population in District 9 is 64.1% Barrington and 35.9% Bristol.

5. Since 1966, when districts were first subject to the one-person, one-vote requirement, a portion of the Town of Warren has always been linked with a portion of northern Tiverton in a senate district.

6. District 10 consists of all of Warren, the northeast portion of Bristol, and a sliver of land about two blocks wide that

connects Warren and Bristol. In order to drive from one end of District 10 to the other, one must drive through District 11 and cross two bridges that do not link the district, the Mount Hope Bridge and the Sakonnet Bridge. It contains the shared interest of the Kickemuit River and Mount Hope Bay; and the manufacturing areas of Warren and Tiverton—the portions of the East Bay that have strong historic links to Fall River. According to the 2000 U.S. Census, the population in District 10 is 14.9% Bristol, 42.9% Warren, and 42.2% Tiverton.

7. District 11 consists of the southern portion of Bristol and all of Portsmouth, including the islands to the west of Aquidneck Island, Prudence Island, Hog Island, Patience and Hope. Given the natural makeup of the area, with the islands and the peninsulas, District 11 is as compact as possible. It is oriented to the East passage and contains the region's ferry connections to Prudence Island; the historic town center of Bristol (those portions of the Town have ties to Portsmouth and Aquidneck Island); and the Town of Portsmouth in its entirety. According to the 2000 U.S. Census, the population in District 11 is 34.7% Bristol and 65.3% Portsmouth.

8. District 12 includes all of Little Compton, the southern portion of Tiverton up to Bulgamarsh Road. In order to drive across the district, one must drive through District 10, cross a bridge not used as a link and then drive through the northern part of Portsmouth, which is in District 11. It is an hour and a half trip, round trip. District 12 shares two sides of the Sakonnet River and the region's significant barrier beaches; the water supply resources of the Newport Water System; and two wineries, one in Little Compton and one in Middletown. According to the 2000 U.S. Census, the population in District 12 is 12.7% Little Compton, 61.3% Middletown, 11.5% Newport and 14.4% Tiverton.

9. District 13 contains the lower portion of the east passage in Newport Harbor with the spillover of boating activity into Jamestown Harbor; the City of Newport almost in its entirety; and the Town of Jamestown, which has historic ties to Newport through ferry and bridge connections and social services, especially including those pertaining to health and housing.

10. The Senate Plan has 15 Districts wholly contained within one municipality; 14 Districts wholly contained in two municipalities; six Districts include portions of three municipalities; two Districts include portions of four municipalities; and one District includes portions of five municipalities.

11. To conduct his analysis, Professor Rives used 2000 Census data, which encompasses a wide range of demographic, economic and social characteristics.

12. Bristol is a diverse community. Both the Index of Dissimilarity and the Variance Analysis establish that Bristol is more socioeconomically heterogeneous than Portsmouth on a broad range of socioeconomic measures associated with communities of interest.

13. The Towns of Bristol and Warren share a school district.

14. The larger the district, the more difficult it is to know and communicate with individual residents.

15. The larger the district, the less likely it is homogeneous.

16. The more homogeneous a district, the easier it is to represent the residents.

17. It is not reasonable to ignore any segment of the population of a district and expect to get elected.

18. An elected representative has more ties and associates with the city or town in which they live.

19. An elected representative can represent different cities and towns within the district and different communities of interest within the district and still be effective.

20. Cities and towns in the East Bay share many common interests.

21. There are socioeconomic differences within certain East Bay districts. Some parts of a district are more similar to parts of another district than they are parts of their own.

22. In many instances the dissemblances are not significant.

23. Portions of the districts in the Senate Plan are not contiguous based on land. Some portions of each district are contiguous by water.

24. Barrington is not connected by land or bridge to western Bristol in District 9. The shores of those two areas within District 9 are connected, however, over a small area of water. On the basis of shore-to-shore contiguity, that district is contiguous.

25. District 10 is contiguous by applying the concept of shore-to-shore contiguity. Warren and eastern Bristol are not connected by land or bridge to northern Tiverton without either entering another legislative district or another state. The shores of the areas within the district face each other and establish shore-to-shore contiguity.

26. District 11 is contiguous. In addition to shore-to-shore contiguity between Bristol and Portsmouth, they are also connected by a bridge. As it relates to District 12, this Court also finds that it is contiguous based on shore-to-shore contiguity. Southern Tiverton and Little Compton are not connected by land or bridge to Middletown and Portsmouth without leaving the district. The shores of the Sakonnet River establish shore-to-shore contiguity. To the extent that the open seas are needed to establish contiguity between the island portion and geographically isolated portions of District 12, such use is valid in this limited context.

27. Contiguity, geographic and functional compactness, population, socioeconomic factors, municipal boundary lines, neighborhoods, geography, communities of interest and district associations are all relevant considerations in redistricting.

28. No statistical measurement of compactness was utilized by either the plaintiffs' or defendants' witnesses.

29. District 11 alone is compact and constitutional and has not been really challenged by the plaintiffs.

30. District 13, except for the dividing line in Newport, has not been challenged by the plaintiffs and is alone compact and constitutional.

31. When comparing the portions of Tiverton in District 10 with Warren, also in District 10, the only significant differences are the owner-occupied homes and native Rhode Islander variables. The same holds true when comparing the section of Tiverton that is in District 12 with Middletown.

32. The district lines in Bristol divided up some areas of common interest and historical alignments.

33. District 12 has the greatest geographical difference and the least similarities of all the districts and is clearly the weakest.

34. Evidence of gerrymandering was not persuasive. Neither Representative Enos' opinion, namely that he was targeted for a difficult district in order to punish him for not supporting the current leadership and that they favored a Republican

senator with an easier district, nor Senator Parella's opinion that each of the female senators had a difficult district was supported by any other testimony or data. There was no evidence of gerrymandering to favor *Democrats v. Republicans, incumbents v. non-incumbents,* or *"leadership" incumbents v. non "leadership" incumbents.*

35. Each district in the Senate Plan possesses some areas of common interest.

36. Neither the statistical data presented by plaintiffs' expert on the socioeconomic factors nor the dissemblance between Bristol and Portsmouth was convincing on the issue of constitutionality.

37. The Alternative Plan submitted by the plaintiffs is reasonable and rational.

38. The plaintiffs' own expert testified that the Senate Plan was not irrational but stated it was not as good as their plan.

39. The Senate Plan as adopted by the General Assembly is reasonable and rational.

### CONCLUSION OF LAW

#### A. Burden of Proof

When reviewing a constitutional challenge of this type in Rhode Island, our Supreme Court has spoken on the matter of the appropriate burdens litigants must carry. It is clear to this Court that plaintiffs have the burden of proving that the Senate plan is unconstitutional beyond a reasonable doubt. This onerous burden of proof is applicable in the context of a constitutional redistricting challenge, such as in the present matter. *See discussion supra.*

■ Redistricting and reapportionment are legislative tasks, and a court should make every effort to refrain from entering that legislative forum. *See McDaniel v. Sanchez,* 452 U.S. 130, 150 n.

30, 101 S.Ct. 2224, 2236 n. 30, 68 L.Ed.2d 724, 740 n. 30 (1981) (quoting *Wise v. Lipscomb,* 437 U.S. 535, 539, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411, 417 (1978)). Clearly, our courts have recognized that the "broad power of the legislature to structure electoral districts" is held in check by the constitutional mandate of compactness. *See Opinion to the Governor,* 221 A.2d at 802. The party making a compactness challenge must establish that the challenged statute was enacted without a rational or legitimate basis. *See Holmes,* 475 A.2d at 986 (citing *Opinion to the Governor,* 221 A.2d at 803). Thus the burden remains, at all times, with the party challenging the constitutionality of the statute to establish beyond a reasonable doubt, as in all constitutional challenges, that the General Assembly acted without a rational basis in enacting the legislation.

■ The plaintiffs assert that the districts were not drawn as compact in territory as possible; therefore, as a matter of law, the burden shifts to the defendants to justify the alleged deviations from the constitutional requirements. The defendants assert that they have no burden to satisfy, all burdens remain at all times with the party challenging the constitutionality of the statute, and, in any event, there has been no deviation from the constitutional requirements.

This Court finds that there is no burden shifting to the defendants as argued by the plaintiffs. Plaintiffs' reliance on the federal district court decision, *Farnum,* is misplaced. In *Holmes,* discussed *supra,* our Supreme Court concretely set forth the applicable standard of review in the context of challenges to the compactness requirement of the Rhode Island Constitution. As such, this Court holds that the burden remains with the plaintiffs to prove that the legislative order is without rational basis and that the Senate Plan is a

complete abandonment of any attempt to draw equal, compact and contiguous districts.

## B. Compactness

The Rhode Island Supreme Court has interpreted the term "compactness" to refer to something more than mere geography. Geography is a factor in determining a constitutional violation of the "principle" of compactness as interpreted by our Supreme Court. As such, finding a violation of the compactness requirement is very rarely black and white, unlike more straightforward redistricting challenges based upon population deviations.

The Rhode Island Constitution, article VIII, section 1, requires that legislative districts be "as compact in territory as possible." Our state constitution contains a compactness requirement only and does not include a contiguity requirement. It is settled in Rhode Island that constitutional compactness refers to a principle and not a precise definition. *Opinion to the Governor*, 221 A.2d at 802. Determining compactness, at times, requires a qualitative approach. *Id.* "The determination of the territory that necessarily would have to be included in a district to provide that the district be as compact as possible is for legislative determination." *Id.* at 803. Compactness, for purposes of constitutionality, must be done with the overriding necessity of maintaining effective representation in the given districts. Our Supreme Court has been clear that the compactness requirement is most essential to the concept of effective representation and does not refer to general spatial relationships.

 Given the qualitative, but limited, approach that a court must take in reviewing this constitutional challenge, a court must review factors that make a challenge capable of meaningful review.

Contiguity, political gerrymandering, and communities of interest, as well as geographical, natural, historical, and political boundary concerns, are factors a court may consider in reviewing a compactness challenge. In addition, in this case it has been noted that the concept of "functional compactness," though never explicitly referenced by the Rhode Island Supreme Court, would be a rational concept for the General Assembly to consider. It appears to this Court that because there is no precise definition or mathematical formula for constitutional compactness, functional compactness is an encompassing concept that should be validly considered, including considerations of reasonable contact with and access to legislative representatives, which are inextricably intertwined with the compactness requirement.

The compactness requirement, applied here, is intended "to provide an electorate with effective representatives rather than with a design to establish an orderly and symmetrical geometric pattern of electoral districts." *Opinion to the Governor*, 221 A.2d at 802. Given our irregular boundaries, factors other than mere geometric shape are crucial. The compactness clause is violated "only when a reapportionment plan creates districts solely for political considerations, without reference to other policies, in such a manner that the plan demonstrates a complete abandonment of any attempt to draw equal, compact and contiguous districts." *Holmes*, 475 A.2d at 986. This Court concludes that the compactness clause was not violated with the Senate Plan.

## C. Contiguity

Contiguity is not explicitly enumerated as a constitutional mandate in Rhode Island but has been cited by the Supreme Court when it noted that "any deviation from contiguity and from natural, histori-

cal, geographical, and political lines for the purpose of achieving a political gerrymander is constitutionally prohibited by the mandate of compactness." *Opinion to the Governor*, 221 A.2d at 803. Additionally, contiguity was considered as a factor in reviewing a compactness challenge in *Licht v. Quattrocchi*, when the Court noted that the defendants "violated the principle of contiguity for impermissible purposes." *Licht*, 449 A.2d at 887; *see also Licht v. Quattrocchi*, 1982 R.I.Super. Lexis 61, *15 (noting further violation of compactness by creating noncontiguous districts that favored some and disfavored others for political purposes). Thus contiguity, though not expressly written in our constitution, is a factor considered by our courts in reviewing a compactness challenge.

In *Holmes*, as in *Opinion to the Governor* and *Licht*, contiguity is a consideration in determining whether there has been a constitutional violation. The Court found that there was indeed contiguity between Newport and Jamestown "because the Newport Bridge connects both the Newport and the Jamestown portions of the district without crossing land of any other district." *Holmes*, 475 A.2d at 986–87.

In *Holmes*, the Rhode Island Supreme Court was confronted with the contiguity argument that was advanced by the plaintiffs at the trial level: because the water under the Newport Bridge was part of District 100, it necessarily meant that one would have to leave District 98 and pass through a different district prior to reentering District 98 and, therefore, there was no contiguity within the challenged district. The trial justice had found that argument unpersuasive, as did the Court, and the argument was defeated with the "without crossing land" language. In addition, the trial justice agreed with another part of the defendant's argument. A small

"hook" of land was put into the Newport portion of the district by the General Assembly, making the shorelines of Newport and Jamestown, in effect, face each other and made the two portions of the district separated only by water. Thus, the lower court found that by adding the small hook of land to Newport, shore-to-shore contiguity had been established. The Supreme Court expressed no opinion on that alleged contiguity because the Court found that the Newport Bridge created contiguity between the portions of the district. *Id.* at 986.

The particular issue of shore-to-shore contiguity that arose in that case is not unique to Rhode Island. The concept of contiguity is often discussed in redistricting litigation. Contiguity generally means that districts are bordering, adjoining, or touching. *See Western Nat'l Bank v. Village of Kildeer*, 19 Ill.2d 342, 167 N.E.2d 169, 175 (1960). One accepted interpretation of contiguity requires every part of a district to be reachable from every other part without leaving the district or crossing its boundary. *See Hickel v. Southeast Conference*, 846 P.2d 38, 45 (Alaska 1992). Another interpretation finds the constitutional mandate of contiguity satisfied even if one has to enter another district in order to reach another portion of the district. *See In re Senate Joint Resolution 2G*, 597 So.2d 276, 280 (Fla.1992).

Courts have examined shore-to-shore contiguity with varying scenarios and conclusions. *See, e.g., In re Constitutionality of House Joint Resolution 1987*, 817 So.2d 819, 827–28 (Fla.2002) (establishing shore-to-shore contiguity in district with Lake Okeechobee, with no connecting territory on northern or southern shores); *Wilkins v. West*, 264 Va. 447, 571 S.E.2d 100 (2002) (upholding district with shore-to-shore contiguity and no bridge connecting land).

Some jurisdictions hold that a district is contiguous without regard to "convenience and ease in travel[ing]" from one portion of the district to the other, and without regard to whether the travel is land-based or water based. *In re Senate Joint Resolution 2G,* 597 So.2d at 280.

Difficult issues involving shore-to-shore contiguity have been reviewed by courts of different jurisdictions. In *Hickel,* the Alaska Supreme Court found that a contiguous district may include the open seas. *Hickel,* 846 P.2d at 45. "[T]he potential to include open sea is not without limits." *Id.* A balance must be made between irregularly shaped natural geography and the need for shore-to-shore contiguity, and the concern for shore-to-shore contiguity extending to impermissible lengths. *Id.* (noting that, without limits, contiguity could mean that any part of Alaska would be contiguous with any other part of Pacific Rim). In Massachusetts, the Supreme Judicial Court has recognized shore-to-shore contiguity in a district involving the irregularly shaped islands in Buzzards Bay. *See Lamson v. Sec'y of the Commonwealth,* 341 Mass. 264, 168 N.E.2d 480 (1960). Shore-to-shore contiguity has been allowed where districts do not "jump over" other districts, and when shore-to-shore contiguity does not create a "collection of geographically isolated oases." *Jones v. Falcey,* 48 N.J. 25, 222 A.2d 101, 106 (1966). *Mader v. Crowell,* 498 F.Supp. 226 (D.Tenn.1980), allowed shore-to-shore contiguity between shores of a river without a bridge, but noted that contiguity would be lacking in a district where "a part [of a district] is isolated from the rest by the territory of another district." *Id.* at 229.

In the case at bar, the plaintiffs argue that the challenged districts—9, 10 and 12—are not contiguous because one must either traverse the land of another district or another state to get from one end of the districts to the other ends, and there are no bridges connecting them. The defendants maintain that shore-to-shore contiguity is established in the districts, a requirement that they argue is not a constitutional mandate, but one factor of many to consider for determining compactness.

Of particular interest to this Court was the Rhode Island Supreme Court's treatment of the 1966 senatorial redistricting maps [22] analyzed in *Opinion to the Governor.* It was adduced at trial that, in fact, there was no land-based contiguity in then Senate District 47. In the 1966 Senate district, district 47 contained Tiverton and Warren. In that district, similar to the current district, travel from one end of the district to the other would entail either entering Massachusetts or entering another district by traveling through Portsmouth and Bristol. Professor Smolski testified that, from a geographer's perspective, then-district 47 was not contiguous. Our Supreme Court could not rule as a matter of law that the map was not as compact in territory as possible. The plan challenged in *Opinion to the Governor* would have necessarily been deemed unconstitutional if land based contiguity was necessary. Further, contiguity, whether land-based or water-based, is one of many factors to consider when considering a constitutional challenge of this nature.

Considering contiguity as a separate and distinct prong of the constitution-

---

22. Attached, as annotated attachments # 2, # 3, and # 4, respectively, are the 1966 Rhode Island State Senatorial District Map, the 2002 Rhode Island State Senatorial District Map and the 2002 Rhode Island State Senatorial Districts for the East Bay Region.

al analysis, this Court holds that the districts in this case, as illustrated by the evidence presented, are in fact contiguous. In the instant matter, while the districts are not contiguous on land, this Court finds that the districts are contiguous on the basis of shore-to-shore contiguity. *See* Additional Findings of Fact by the Court after Trial, *supra.*

Contiguity is a factor to be considered by Rhode Island courts in determining whether there has been a violation of the constitutional mandate of compactness. The opinions of the Rhode Island Supreme Court have consistently discussed contiguity. Courts of other jurisdictions have established contiguity on a shore-to-shore basis. Additionally, the trial justice in *Holmes* determined that shore-to-shore contiguity had been established by adding a small hook of land to the shoreline. Attempts could be made to stretch shore-to-shore contiguity to create absurd or illogical districts, and the discussions in the cases cited above acknowledge that concern. In such a situation, a court would need to determine, in considering all relevant factors, whether such a deviation in the districting principles have no rational bases, beyond a reasonable doubt. Finally, in this case, even if shore-to-shore contiguity is not accepted in Rhode Island, in light of all the relevant factors considered by this Court, the principle of compactness has not been violated because it has not been shown, beyond a reasonable doubt, that the citizens of the challenged districts are not being effectively represented.

## D. Communities of Interest

When a party challenges a legislative district based upon the compactness requirement in the Rhode Island Constitution, one factor to consider is the existence of communities of interest. Evidence that there has been a complete disregard for existing communities of interest is relevant in showing that, beyond a reasonable doubt, a legislative district is irrational.

At trial, plaintiffs attempted to establish that there was no rational basis for dividing the municipalities and placing them within the different districts. The experts of plaintiffs and defendants all offered opinions as to communities of interest. Despite the questioned level of measurability for these communities of interests or the argument for post hoc rationalization, the evidence is not necessary to the resolution in this matter.

Testimony was presented by both parties regarding geographic, natural, historical and political boundary concerns. Geographic considerations, as well as concerns for natural, historical and political concerns, are all legitimate factors considered by the Court. The Court did not find any of the factors that should be considered to be sufficiently compelling in the challenge to the Senate Plan. There were differences and similarities within each district. Some natural, historic factors were presented; some were not. Those factors, either individually or collectively with the other enumerated factors, do not establish a constitutional violation in this case.

In this case, once the decision was made to divide Bristol into three districts instead of Portsmouth, necessary steps logically followed. The need to divide one of the two towns into three senate districts was established at trial. The redistricting statute divides Bristol into three districts; the Smolski alternatives divide Portsmouth.

The Smolski alternatives present reasonable and well-planned districts. However, neither they nor Professor Smolski established that there was no rational basis for the senate districts as enacted by the General Assembly. The plaintiffs have not satisfied the burden of proof necessary

to successfully challenge the constitutional mandate of compactness based upon the territorial compactness and other natural, historical and political boundary concerns. The odd physical layout of the land and the rational decision to divide the Town of Bristol contribute to the results reached by the General Assembly. Professor Smolski's plans may have been preferable, in the plaintiffs' opinion, to the General Assembly's plan, but this Court is not empowered to pit the two plans against one another and find which one is better. The role of this Court is not to second guess the legislature. *See City of Pawtucket v. Sundlun,* 662 A.2d 40 (R.I.1995). The alternative plans are not sufficient, without more, to successfully challenge the constitutionality of the redistricting statute. Therefore, this Court finds that the compactness requirement of the Rhode Island Constitution has not been violated, beyond a reasonable doubt, based on the evidence involving communities of interest in this case.

### E. Population

 Although plaintiffs concede that population, as an isolated factor, is insufficient to find the Senate Plan unconstitutional, plaintiffs have argued that the population deviations in the challenged districts are extremely close to violating the Equal Protection Clause of the Fourteenth Amendment. This Court does not find this argument persuasive in light of the relevant case law. In *Sims,* the United States Supreme Court stated that population equality should be a goal in any state redistricting plan; however, some latitude must be given in order to preserve political subdivisions and peculiar state interests. "Minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie case of invidious discrimination under the Fourteenth

Amendment so as to require justification by the State." *Brown v. Thomson,* 462 U.S. 835, 842, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214, 221 (1983).

 An overall deviation in population that is less than 10% is generally said to be constitutionally sufficient. *Id.* The challenged Senate districts all fall within the aforementioned range. As such, the actual deviations are held to be *de minimis* in light of judicial precedent. The median average population deviation in the challenged districts is 7.35%; whereas, the median average population deviation for the Senate plan as a whole is 9.91%. Therefore, this percentage falls within the clearly defined range for acceptable population deviations in the context of state redistricting plans. Special exceptions were not tolerated by the legislature. Constitutional standards were analyzed and followed in light of the enormous task of finding the appropriate middle ground between population equality and the redrawing of state district lines.

### F. Political Gerrymandering

The presence of a political gerrymander is an important consideration in determining whether there has been a violation of the principle of compactness. Of course, creating a district for purely political concerns is impermissible. A political gerrymander is effected "by a delineation of the boundaries of electoral districts in such a manner as to exclude therefrom, or to include therein, groups of voters whose political affinities may reasonably be surmised and whose political action is reasonably certain." *Opinion to the Governor,* 221 A.2d at 802. Usually, the delineation is without reference to the physical features of the area. *Id.* The districts are also drawn without a rational relationship to relevant concerns such as the existence

of historical, natural, and political boundary lines. *Id.*

In *Licht* and *Farnum*, the courts found political gerrymandering and thus found the respective redistricting plans unconstitutional. Other factors are relevant when analyzing the constitutional requirement for compactness. It would appear that a district could still be found unconstitutional even if there is no evidence of political gerrymandering. That is, the principle as enunciated by our courts reveals the need for effective representation in a given district. Quite simply, if a district is drawn for political considerations, the citizens within that district are not being effectively represented and the district is invalid. However, effective representation concerns may arise when districts are drawn despite the lack of political favor or disfavor in drawing the districts, as for example, if no consideration for contiguity or other related boundary concerns is given.

Nevertheless, in this case, the record evidence reveals the lack of any compelling evidence to satisfy any claim for political gerrymandering. The only person that enunciated such a claim, Representative Enos, did not seek re-election in the senate district in which he claims gerrymandering occurred. Whether political gerrymandering refers to the effect felt by voters in the district or the person seeking election is immaterial in this case as no evidence has been introduced to make such a claim. The only evidence presented revealed that then-Senator Enos, after the current senate leadership came to power, did not maintain the positions within the senate leadership or on other senate committees as he had during the prior senate leadership. Senator Parella noted that she believed the women in the Senate each had more difficult districts after redistricting.

Neither the opinion of Senator Parella nor Representative Enos was substantiated by any other testimony. Representative Enos may have won the election if he had run for the senate seat in District 12. He may have well been correct in believing that he would not have won an election against Senator Gibbs. There is no evidence, however, that the district was drawn with the intent to punish him or reward another. Indeed, there is no evidence in the record to suggest that any of the districts, when drawn, were drawn with an intent to favor or disfavor a person or group based solely upon political considerations. Accordingly, this Court holds that the plaintiffs have not established a sufficient proof of claim for political gerrymander.

### *SUMMARY*

The confluence of the constitutional mandate for reducing the size of the General Assembly and the requirement for reapportionment following the 2000 Census created a unique situation for Rhode Island. The downsizing of the General Assembly necessarily meant difficult choices had to be made, including the location of new district lines. Finally, because of Rhode Island's "irregular boundaries, its bays and its inlets, its islands, its rivers and lakes and its many other geographical features," *Opinion to the Governor*, 221 A.2d at 802, drawing the district lines for the 2002 state senatorial election was further complicated.

The Rhode Island Supreme Court has expressed a desire for courts to remain out of this legislative arena. They have directed that great deference be given to our legislators in enacting such legislation. The boundaries are not insurmountable, but they reflect the concern for unwanted disturbance with the legal process.

Making the plaintiffs' burden even more difficult to meet is the very nature of Rhode Island. The state is a small, irregular land mass, the heart of which is Narragansett Bay. The East Bay districts are surrounded by the East Passage of Narragansett Bay and the Atlantic Ocean. The residents of the Bay have strong historic, social and economic interests in the Bay and with each other. Their interests, while not the same, are similar because of their geographic position within the Bay and the relationship to the rest of the State.

Thus the high burden of proof prescribed by our Supreme Court makes the task of challenging said legislative redistricting difficult. The plaintiffs accepted that challenge and argued their posture with conviction, skill and eloquence, but in the end without success. It is this Court's finding that the plaintiffs have failed to provide this Court with evidence beyond a reasonable doubt that any deviation from the constitutional requirements has occurred.

The plaintiffs have failed to establish, beyond a reasonable doubt, that the redistricting statute is irrational and has abandoned the established principle of compactness and is, therefore, unconstitutional. The plaintiffs have not satisfied the high burden of proof required in a case such as the one at bar. Therefore, as plaintiffs have not satisfied their burden, defendants' motion for judgment pursuant to Rule 52(c) is granted.

### CONCLUSION

For the aforementioned reasons, based upon this Court's findings of facts and conclusions of law, the defendants' motion for judgment is granted. Section 22-1-2 of the Rhode Island General Laws, the redistricting statute, has not been proven unconstitutional. Counsel shall confer and submit an appropriate order.